Filed 4/13/15  P. v. Rivera CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHN RUBEN RIVERA, JR.,<br><br>    Defendant and Appellant. | F066130<br><br>(Super. Ct. No. CRM008326)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Rebecca Whitfield, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

By amended information filed May 28, 2010, John Ruben Rivera, Jr., (defendant) was charged with murdering Raymond Sabala on or about April 21, 1998, in violation of Penal Code section 187, subdivision (a). It was further alleged defendant intentionally and personally discharged a firearm, proximately causing great bodily injury and death. (*Id*., § 12022.53, subd. (d).) Following a jury trial, defendant was acquitted of first, but convicted of second, degree murder, and the firearm enhancement was found to be true. Defendant's motion for a new trial was denied, and he was sentenced to 40 years to life in prison and ordered to pay restitution, as well as various fees, fines, and assessments.

On appeal, we hold: (1) The trial court did not commit prejudicial evidentiary or instructional error; (2) The prosecutor did not commit prejudicial misconduct; (3) Defendant is not entitled to reversal based on cumulative prejudice; and (4) Defendant has failed to establish ineffective assistance of counsel on appeal. We affirm.

## FACTS

### I

#### PROSECUTION EVIDENCE

Rosemary Reclosado and defendant became a couple sometime in 1996, but she had stopped seeing him by April 1998.[1] Reclosado met Sabala through defendant, but only saw Sabala when he was with defendant.

On April 18, defendant telephoned Reclosado and left angry, threatening messages on her answering machine at various times during the day. At some point when defendant called, a male — whom Reclosado identified at trial as Todd Logan — answered the telephone. After Logan hung up, Reclosado had reason to believe defendant was coming over to her apartment, and that there was going to be a problem. She decided to leave, and got into a car containing Tina Garibay and another woman.

---

[1] Undesignated dates in the statement of facts are to the year 1998.

Defendant suddenly appeared, pointed a gun at the people in the car, and got into the car himself. Garibay started driving around the block. Reclosado, who was scared and crying, told defendant she did not love him anymore. He started hitting her, despite the other women yelling at him to stop.

At some point, defendant told Garibay to stop the car. Still carrying the gun, he got out with Reclosado. Chris Warmsley, defendant's friend, drove up. Reclosado felt she had no choice but to get into his car, so she went with him and defendant to a house on Yosemite Parkway. At the house were several males and a female, none of whom she knew. At some point, Reclosado slipped into the kitchen without defendant's knowledge and called home. After defendant learned of the telephone call, he did not let Reclosado leave his sight.

Defendant subsequently instructed Warmsley to get a motel room for him. Upon Warmsley's return, he gave defendant a room key, and defendant — who still had the gun — forced Reclosado to accompany him to the motel. Once in the motel room, she and defendant started arguing, and continued to do so for most of the evening. Defendant wanted to know why "he" was in Reclosado's house, answering the telephone. Reclosado threw part of the motel room telephone at him, striking him, whereupon defendant started hitting her in the face. She sustained two black eyes, swelling, and headaches. He also pointed the gun at her on occasion. In addition, he showed her the gun was loaded, pointed it at his head, and threatened to commit suicide. He also said that if the police came for him, he would shoot at them because he did not want to go back to prison.

The next morning, defendant told Reclosado this was the last time he would see her. He also said that if he saw her with anyone else, he would really hurt her. He then left and, after making sure he truly was gone, she telephoned her mother and walked home. At no time before leaving the motel did defendant give Reclosado a .22-caliber

pistol as a keepsake. The only gun she saw that night was the large silver or chrome automatic he pulled on her and the people in the car.

The incident was reported to police. When interviewed by a detective, Reclosado related she had been kidnapped at gunpoint. She understood the reason defendant had kidnapped and beaten her was because he thought she was with another man. At trial, Reclosado testified that the whole incident concerned defendant's jealousy over what he perceived to be Reclosado's relationship with Logan. Reclosado denied having a relationship with Logan or ever having a sexual relationship with Sabala. When defendant asked her, during the kidnapping, who answered the telephone at her house, she told him who it was. She told defendant she was not involved in a relationship with Logan, but that did not satisfy defendant.

Defendant was arrested in connection with the kidnapping around 9:00 p.m. on April 21. When interviewed by Merced Police Detective Clair, defendant said he did not do anything, and that Reclosado went with him willingly.[2] He said he had gotten upset because he learned she was seeing someone else, although he did not name the person he believed she was seeing. When Clair said it appeared Reclosado had been beaten, defendant said they had gotten into an argument when they were getting into a car, and he had grabbed her in a headlock. Defendant denied having a gun, although later in the interview he said he had a small .22-caliber that Reclosado had always liked, and he had given it to her as a gift. When asked about counterfeit money arresting officers recovered during a foot pursuit of defendant, defendant became somewhat agitated and said something like, "That will strike me out. It's not mine." Defendant pled guilty to kidnapping on October 15.

---

**2** A number of law enforcement personnel had retired or changed rank or position by the time they testified. To the extent possible, we refer to them by the rank or position they held at the time of their participation in events.

On April 23, John Blitch, who worked at Merced Wildlife Refuge, was having lunch when a photographer came to the office and said someone was hurt. When Blitch went to investigate, he found Sabala's body partially in the water of one of the ponds near the one-way, auto tour road.[3] Blitch traveled that road almost every day. He did not see the body on April 22.[4] The tour route was open to the public from half an hour before sunrise to half an hour after sunset. The wildlife refuge had an automatic gate that opened at sunrise and closed at sunset. After sunset, the gate allowed vehicles to exit, but not to enter, the refuge.

Dr. James Wilkerson, a forensic pathologist, performed the autopsy on Sabala. Sabala had three gunshot wounds. One, to the mid forehead area, exited the right back of the head. There was no evidence of close-range firing. Another, to the left back of the neck, exited the right side. This wound likely would have been disabling and probably eventually fatal. Soot in the wound was evidence of close-range firing, with the gun probably loosely against the skin. The third, to the lower back, exited the hip. Wilkerson determined the cause of death was multiple gunshot wounds and the manner of death was homicide.

---

[3]     No identification was found at the scene. Sabala was identified through fingerprints.

[4]     Neither Blitch nor the photographer had noticed the body earlier on the day it was found, even though Blitch had been mowing on the opposite side of the road and the photographer had driven by the area. Once someone knew the body was there, it was visible from the road. It was in tall enough grass, however, that it was difficult to see unless someone was looking directly at it. Blitch opined the body could have been there the day before, as he "[v]ery easily" could have driven by it and not seen it. Refuge Officer Merrill drove to the scene when contacted by Blitch. The body did not appear to him to be immediately visible from the road. In Merrill's opinion, it was possible the body could have lain undiscovered for as many as two days. The area was only patrolled sporadically. Merrill had heard a "pop" in the area the preceding evening. As a game warden, he was familiar with gunshots. In his opinion, the noise was from a cutting torch such as he was using at the time.

Wilkerson originally estimated the time of death as 12 to 36 hours before the body was found.[5]  This was based on his review of photographs and reports, the only materials he had.  Since then, he had also looked at video of the crime scene filmed by a sheriff's detective while the body was present; weather data; insect activity on the body; and skin slippage and tanning.  It was now his opinion Sabala was dead for 24 hours to perhaps as long as 72 hours before his body was found.  Sabala being murdered sometime in the late afternoon or early evening hours of April 21 was consistent with Wilkerson's analysis regarding time of death.  However, Wilkerson considered it possible Sabala could have been seen alive after April 21.

Sabala's family members directed investigators to Dawn Santos, whom the family identified as the person who transported Sabala everywhere.  A number of witnesses named Santos as the person with whom they last saw Sabala alive.[6]  When Norris first interviewed Santos on May 1, Santos admitted knowing Sabala, but denied knowing anything about his murder or being at the scene.  However, Santos had a small yellow "chickee," like the one found in the center of the roadway at the crime scene, hanging from the rearview mirror of her black Honda Civic.  There were also five spent nine-millimeter shell casings — the same caliber as the murder weapon — in her car that matched casings found at the murder scene.  Santos explained the spent casings were used to transport illegal drugs, a story that struck Norris as a lie.  Santos told Norris she did not let anyone drive her car other than Gonzalez, and she had to be with him if he drove it.  She later changed that statement and said Gonzalez had a set of keys.  Santos said she last saw Sabala when she dropped him off at The Commons in Merced at

---

[5]     Merced County Sheriff's Detective Norris, the lead investigator for the case, was present at the autopsy.  She recalled Wilkerson stating Sabala had been dead at least 24 hours.

[6]     Several of these witnesses said Mike Gonzalez was with Santos and Sabala.

1:00 a.m. Wednesday, April 22.  Norris obtained an arrest warrant for Santos for Sabala's murder, but the district attorney's office declined to file charges.

Defendant was considered a "person of interest" early in the investigation, based on what people told investigators and some things found in Sabala's property.  When Norris learned he had been arrested on the night of April 21, her evaluation of defendant as a suspect diminished in light of Wilkerson's original estimate of the time of death.

While in custody at the county jail, defendant sent word to Norris and Detective Parsley that he wanted to talk to them about the homicide.  They had a brief meeting on April 30, then a longer interview at the jail on May 20.  Defendant described himself as a good friend of Sabala.  He named Gonzalez as the person he believed had killed Sabala.  Defendant said he wanted to make a deal to have his current charge reduced, because he wanted to get out and see his children.  Defendant admitted he was involved in a counterfeit money scheme.

Defendant said he told Sabala to go to the home of defendant's father to get defendant's bulletproof vest and nine-millimeter firearm, and that on the night people said Sabala died, Sabala dropped defendant off at a motel at a trailer park.  He also said he provided the gun Gonzalez used to commit the murder, and he was worried his fingerprints were going to show up on that weapon.  Defendant said he was willing to wear a wire to set up Gonzalez and get him to "give up" the gun's location, but he needed to be out of custody to do this.  Norris said no.

In February 1999, defendant, who was now in prison, initiated another conversation with Norris and Parsley.  Defendant wanted to know if he was going to be charged in connection with any of the information he was providing.  Told the detectives were not looking to charge him with anything else, defendant related he was running a counterfeit money ring, and that Sabala, Gonzalez, Santos, and Warmsley were involved.  Defendant said he knew Gonzalez shot Sabala because defendant gave Gonzalez "'the

7.

9.'" Defendant described the gun as a nine-millimeter Black Star.[7] When asked how he knew Sabala was shot with a nine-millimeter, defendant said he did not know, but he seemed confident it was a nine-millimeter weapon.

Defendant said he had called Santos while he was in custody, and she told him Gonzalez killed Sabala. Defendant thought Gonzalez committed the murder because Sabala was "hanging out" with Santos too much, and possibly having a relationship with her. Defendant said he sold the gun to Gonzalez a month before the killing occurred, because Gonzalez came to him and asked him for the gun, but defendant had no knowledge Gonzalez intended to use it to kill someone. About a week before the murder, however, Gonzalez told defendant he wanted to kill Sabala over Santos. Defendant tried to talk him out of it.

Jesus "Jesse" Serena and defendant had known each other about 15 years. In 1998, Serena ran into defendant in the county jail. Serena told defendant Sabala had been killed.

In 2003, Serena, who was then in custody on a felony domestic violence charge, notified the Merced County Sheriff's Department that he had some information regarding a homicide. Detective Garcia subsequently met with him. Serena was hoping to get a shorter prison sentence in return for telling what he knew, but no agreement was ever made, either with Garcia or the district attorney's office.

Serena related to Garcia that the year before, he and defendant had been in the Security Housing Unit (SHU) in Corcoran State Prison. They were friends at the time. Although they had little direct contact while in SHU, they were able to pass notes called "kites." Defendant sent Serena a kite in which defendant talked about having killed Sabala.

---

**7** Information concerning the gun had not been given to the media.

Defendant and Serena subsequently had a conversation in the prison law library in which defendant said he drove Sabala out to the country and shot him in the back of the head, point blank. Defendant said he killed Sabala because he believed Sabala was having an affair with defendant's girlfriend, Reclosado, behind defendant's back. Defendant told Serena he had plans to make Reclosado disappear when he was released from prison and to kill Reclosado's boyfriend, "Turtle." Serena gave this information to Garcia in part because he was concerned about Reclosado, but also because defendant was laughing and bragging about killing Sabala, with whom Serena had grown up.

In 2004, Serena and defendant were cellmates in the Merced county jail. Defendant again admitted killing Sabala. He said he shot him in the back of the head, and Gonzalez and Gonzalez's girlfriend were present. Defendant said he had planned to kill Reclosado before he killed Sabala; it was in retaliation for her having had an affair with Sabala. Defendant grew somewhat emotional when he talked about killing Reclosado. During one of the conversations, defendant told Serena that Sabala was having sex with Gonzalez's girlfriend. Defendant said he talked to Sabala about it and told him he could not be doing that.

Serena had been in prison off and on since 1990. According to him, prisoners develop an instinct about when someone is lying. Serena believed defendant was telling the truth about having murdered Sabala. Serena had heard defendant talk about a book titled "The 48 Laws of Power." It was about manipulation, and was commonly read in prison. In Serena's experience, manipulation was a big part of defendant's personality. Serena once described defendant as a "'talker who tried to intimidate people.'" In Serena's experience, however, someone does not get respect in prison for admitting to things done on the outside.

In June 2005, defendant again initiated contact with the sheriff's department, and was interviewed by Detective McClain. Defendant said he had been told he was a suspect in Sabala's murder. Defendant denied having anything to do with it and named

9.

Gonzalez as the perpetrator. Defendant said that a week before the murder, Gonzalez told defendant he wanted to kill Sabala. Defendant said he thought Gonzalez killed Sabala because of Sabala's relationship with Santos. Defendant said nothing about having sold or provided a gun to Gonzalez.

In the first part of 2008, Merced County Sheriff's Detective Hale was assigned to the Sabala homicide as a "cold case." On July 22, 2008, he interviewed Santos, who was in custody at a local facility for violating probation. She neither asked for a deal in return for information nor told him anything new.

Hale subsequently had a conversation with an inmate at the prison in Susanville, as a result of which he deemed defendant to be a suspect. The conversation prompted him to contact Santos again, and he interviewed her on January 29, 2009. She was neither in custody nor facing charges. Santos claimed to have no new information about Sabala's murder, but Hale told her he believed she was continuing to withhold information. He did not threaten her or offer her anything in return for a truthful statement, but he suggested it was time for her to come to terms with what happened and put the matter in her past. Hale had information Santos was in a drug program at the time, and at some point during the interview, he made another appeal to her to level with him and tell him the truth about what happened. At some point, Santos broke down emotionally. She expressed fear for her safety and the safety of her family, and was concerned that defendant was out of custody. Hale informed her defendant was, in fact, in custody at the time. Santos provided information regarding the evening of April 21, 1998.

Based on Santos's statement, which Hale considered to be new and important information, Hale's investigation focused more on defendant.[8] When Hale compared

---

[8] Hale was aware that within days of the discovery of Sabala's body, Warmsley, Angelina Berumen (Sabala's niece), Jamie Rodriguez, Jamie Snarski, and Sheree Gregory had given statements to investigators that they had seen Sabala alive hours and even days after defendant was in custody. During the course of the investigation, Hale

Santos's statement to the existing evidence, he found some inconsistencies between dates and times.[9] He had information from Santos that she was a serious methamphetamine user at the time Sabala was killed, however, as were many of the people involved in the investigation. In Hale's experience, persons using methamphetamine are not very reliable with regard to time, dates, and places.

Hale spoke to Santos again after viewing the "City Beat" video and told her he had some concerns about the timeline she had provided. When Hale showed Santos the video, she was confused and said she did not know how it was possible. Three days later, Santos contacted Hale. She said she had been home, thinking about everything, and she changed her story.

Sometime after his interview with Santos, Hale learned defendant had written a letter to Denise Mancha. In it, defendant talked about getting out of prison and finding religion, and he expressed concern over whether the Lord would forgive him because he had killed before. He did not say who he had killed.

Based on the information received from Santos and his additional investigation, Hale had defendant, who was still in prison, arrested. Defendant subsequently waived his rights and agreed to speak to Hale. Defendant said he had learned of Sabala's murder from a newspaper while he was in custody, he was in custody when the killing occurred, and Gonzalez was the person responsible for Sabala's murder. Defendant said he knew this because he had a conversation with Gonzalez in which Gonzalez said he wanted to kill Sabala. Defendant said he felt like he had saved Sabala, because Gonzalez had asked

---

had cigarette butts found at the scene, a shirt found in Santos's car, and possibly one other item of physical evidence tested. Defendant was excluded as a DNA donor on all the items.

[9] For instance, Hale had viewed a video made by the Merced Police Department called "City Beat." The video, which was made for a public relations television program and showed different units within the police department, was filmed shortly before 2:00 p.m. on April 21. It showed Sabala alive. Warmsley was in the video with Sabala.

for a gun and defendant did not give him one, and defendant felt he had talked Gonzalez out of killing Sabala.

Defendant denied providing or selling a gun to Gonzalez. He acknowledged possessing guns, however. Although defendant was not authorized to possess any firearm at the time, he indicated to Hale that he had owned a Tec-9 — an outlawed weapon — and a nine-millimeter prior to the murder. It appeared from the evidence and information Hale possessed that Sabala was killed with a nine-millimeter weapon. When Hale asked if defendant was experienced with firearms, defendant said he never even knew how to use them, and that he sold the Tec-9 for drugs.

When Hale asked if defendant had ever killed before, defendant said no. He claimed he had never told anyone he killed Sabala, but he had not denied it. Defendant said he did not deny murdering Sabala because he used people's belief he had done so as an intimidation factor. Defendant said this strategy was "straight out" of the book "The 48 Laws of Power." Asked why, if that was his purpose, defendant would admit something like that to Mancha, since she was not in custody, defendant said he had a reputation with her that he had to uphold.

Hale was aware of Serena's 2003 statement that defendant had admitted killing Sabala. After speaking with defendant, Hale initiated an interview with Serena, who did not request anything in exchange for talking to him about the homicide. The statement Serena gave Hale was consistent with his 2003 statement.

Larry Gomez, who had known defendant and Sabala a long time, was sentenced to prison in 1998 and was still in prison when he testified. Prior to 1998, he and defendant were involved in gang activity. In addition, Sabala had been staying at Gomez's house off and on for a few weeks before he was killed. Gomez learned of Sabala's murder while out of custody. He believed then that defendant was involved.

In 1998, while both were in the county jail, Gomez and defendant had what Gomez termed "a small conflict." Defendant tried to put a "snitch jacket" on Gomez and set him up to be harmed. Nothing came of this conflict.

Near the end of 2008, Gomez came in contact with defendant, who had been transferred to the prison at which Gomez was incarcerated. They discussed their earlier problem and concluded it was basically a misunderstanding. Defendant said he needed to get his hands on a copy of "The 48 Laws of Power," because it would help him win his court case. Defendant told Gomez multiple times that he (defendant) had killed Sabala. Defendant said he, Gonzalez, Santos, and someone else had left Sabala at the wildlife refuge. Defendant said he had used information obtained from "The 48 Laws of Power" to send detectives investigating Sabala's murder on a wild goose chase. Defendant said he was manipulating the investigation through his knowledge of the book, and there was no way law enforcement could tie him to the case, find the murder weapon, or find any witness to testify defendant had killed Sabala.

In 2009, Gomez learned defendant had been charged with Sabala's murder. On July 13, 2009, Gomez sent the district attorney's office a letter in which he stated he had information regarding the crime. Gomez subsequently was interviewed by Hale, who asked what Gomez wanted in exchange for his testimony. Gomez, who was serving a 25-year sentence imposed in 1998, said he wanted "to be out." Hale said he was not in any position to offer Gomez anything in exchange for information, but that Gomez would have to talk to the district attorney about it. Gomez agreed to speak to detectives anyway.

Gomez told the detectives that in the weeks before Sabala's death, Gomez had told Sabala he was "messing up" and putting himself in danger of getting killed. This warning was based on Sabala's lifestyle, drugs, and "messing" with other people's girlfriends. Asked by Hale about a woman named Rodriguez, Gomez said he believed both Sabala and defendant had been having some kind of relationship with her. Gomez also told detectives that Sabala was "messing" with Gonzalez's "old lady." At some

13.

point, Gomez offered Sabala a gun with which to protect himself, but Sabala did not take it.

Gomez told detectives he knew about the counterfeit money operation in which Sabala and defendant were heavily involved. Gomez said Sabala was "burning" people with the counterfeit money. Sabala was using methamphetamine heavily at the time, and he told Gomez he was trading some of the counterfeit money for methamphetamine. Sabala and defendant were supposed to be splitting the profits from the counterfeit money, but Sabala was using the counterfeit money for his own benefit and cutting defendant out. What Sabala was doing caused problems with a lot of people, and defendant was one of them.

Gomez told detectives defendant often committed crimes and then admitted them to scare people so they would think he was dangerous. In Gomez's experience with defendant, defendant would rather be praised for the things he did than just get away with them. Defendant's telling people he did certain things because that would make them fearful of him and get him respect in prison was not the way prison worked, however. Although what was done on the outside started the process, reputation was defined more by what was done on the inside of the prison than on what was done on the outside.

Gomez denied any agreement had been made with him to seek a reduction in his sentence based on his testimony in this case. He denied being given any benefit whatsoever for testifying. He agreed to testify anyway basically to get justice for the Sabala family and particularly Sabala's daughter. He admitted, however, that one of the reasons he was testifying was the hope of getting time off his sentence.

At the time of Sabala's death, Sabala and Rodriguez were living together as boyfriend and girlfriend. Sometime before he was murdered, Rodriguez got into a fight with a female defendant knew. Defendant hit Rodriguez in the mouth, knocking out some teeth and causing her to undergo surgery. Rodriguez did not report the incident to

police, because she was scared defendant was going to do something to her and her family.

Sometime after Sabala was murdered, defendant, who was in custody on other charges, called a house where Rodriguez was present and asked to speak to her.[10] During this conversation, defendant said he had murdered Sabala. Defendant also asked if Rodriguez had received a letter in the mail with her child support check. She had; the check had come with a napkin on which was written, "I'm a parent myself. I'm sure you need this. Don't trust your friends. Johnny." It also said "Loco Man" on it. The envelope was postmarked March 25, Stockton, and bore an address at which Rodriguez no longer lived. The date on the check was March 1. There appeared to be tape across the top of the envelope. Rodriguez's child support checks, which came from the welfare department, often ended up missing. Sabala was living with Rodriguez, and in and out of her house, in the months leading up to his murder. It was possible he could have taken her child support check.[11]

Rodriguez and Sabala were heavily using methamphetamine at the time of Sabala's murder. Rodriguez remembered talking to Norris a couple of days after the body was found, but did not recall what she told Norris. Rodriguez was not on methamphetamine as of 23 days before she testified. Previously, however, she had been taking a lot of drugs. She "probably" told Norris that she last saw Sabala alive at 4:00 a.m. on Wednesday, April 22, but at the time she "wouldn't know what Wednesday was." She was not on drugs when she spoke to Hale on August 7, 2009, and told him she saw Sabala the night he was murdered. She saw Sabala at 4:00 a.m. one morning, but even as of trial did not know what day he was murdered. She told Norris whatever Norris

---

[10]    Having tried to make telephone calls from jail, Rodriguez was aware the telephone user was notified the call was going to be recorded.

[11]    On April 29, Gomez told sheriff's personnel about having seen this check at Rodriguez's house and then in Sabala's wallet when Sabala was at Gomez's house. None of Sabala's fingerprints were found on the check when it eventually was tested.

wanted to hear, because Rodriguez "was high as hell" and wanted Norris and the police out of her house. When she spoke to Hale, she remembered Sabala walking into her house at 4:00 in the morning, waking her up, and telling her he loved her. He had never told her that the whole time they were together, and she knew something was wrong. She was unable to say what day, although she told Hale it was 4:00 on the morning he was murdered.[12]

Santos testified that in April 1998, she was 21 years old. She had voluntarily sent her two children, then ages five and three, to live with their father because of the type of people who came to her apartment. At the time, Santos had a serious drug problem involving cocaine and methamphetamine. She injected drugs virtually every hour of every day. Most of her days were spent trying to locate or obtain drugs. Because of her drug use, she was not very tuned in to day and time.

Santos lived with Gonzalez, whom she had been seeing for about two years. She had known Sabala about a year. She was not romantically involved with him, although he had a reputation as a ladies' man and flirted with every female. She had known defendant for three or four months. Defendant's nickname, which he had gotten due to his behavior and actions, was Loco Man.[13] Santos, Gonzalez, and Sabala were all using methamphetamine at the time. Santos and Gonzalez injected it, while Sabala smoked it. They were all also involved in a counterfeit money scheme. The counterfeit money came from defendant, who got it from someone else and then gave it to them to buy drugs and exchange for real money. Santos, who had a black Honda Civic, was the designated driver for the group.

---

[12]     Rodriguez explained that when someone is on methamphetamine, "[e]verything goes fast," and the person's mind does not think about any time or date.

[13]     During this timeframe, Santos was afraid of defendant because of things Gonzalez had told her and having seen defendant be violent with Reclosado and others.

16.

On April 21, Santos got together with defendant and Gonzalez. That afternoon, they picked up Sabala and, with Santos driving, went to a neighborhood on the south side of Merced to pick up drugs. Santos drove around the block while Sabala met with someone in The Commons, an apartment complex, then picked him back up. Sabala expressed concern that they had been "shorted." Santos did not know until later that Sabala had stashed methamphetamine in his rectum, although keeping drugs for oneself and even "ripping off" friends was a common occurrence in Santos's experience as a serious drug user.[14]

After they picked up the methamphetamine, they went elsewhere to use it, as was their habit. They sometimes went out into a rural area to use drugs or to shoot guns.[15] As a result, Santos commonly had shell casings and cartridges in her car. Whenever the men fired the guns, they picked up the shell casings and put them in the car. The empty casings were used for transporting drugs.

On this occasion, defendant directed Santos to Merced Wildlife Refuge, where she had never been. She assumed the group was going there to get high. Santos drove a ways onto the refuge road, turned around at Gonzalez's direction, and stopped the car. Everyone got out, and she went into the bushes on the other side of the road to relieve herself. While she was doing so, she heard a gunshot. This did not shock her, as she had been with this group before when guns had been fired. She did not hear anyone say anything. When she returned, however, she saw defendant pointing the gun at Gonzalez,

---

[14] A baggie of suspected methamphetamine was removed from Sabala's rectum during the autopsy.

[15] Prior to April 21, Santos had seen defendant with a black gun she was told was a nine-millimeter.

17.

and Sabala on the ground. She understood Sabala had been shot, but did not know why. He was making a gurgling noise.[16] Gonzalez was looking at him.

Defendant pointed the gun at Santos when she walked up. She was screaming and he told her to shut up. He then stood by Sabala, pointed the gun down at him, and shot him two more times. At that point, it appeared to Santos that Sabala was dead. Defendant pulled something out of Sabala's pocket, but Santos did not see what it was. He then told Gonzalez to put Sabala in the water, and Gonzalez did so by dragging the body from the road, where Sabala had been killed.[17] Santos was still screaming, and defendant told her to get in the car. She obeyed. They then drove out of the wildlife refuge. Santos drove; defendant, who still had the firearm in his hand, was behind her. There was no conversation about what had just happened.

Santos did not know where they were, but at some point she started to feel sick, so she pulled over at a car wash and got out to throw up. She saw there was blood on her car and started to scream again, and defendant told her to get back in the car and Gonzalez to wash the vehicle. Gonzalez obeyed. Defendant did not say anything to Santos about what had happened. He did not seem upset.

After leaving the car wash, Santos returned to her apartment. Defendant came into the residence with her. He took her and Gonzalez's clothes and shoes, told them they better keep their mouths shut, and left. About 30 minutes later, he returned and told Gonzalez to get rid of the gun used to kill Sabala. Defendant had with him pictures of Santos's sons playing in their father's front yard. She felt defendant was sending her a

---

**16** The pathologist explained that gurgling happens when someone is dying, and he opined the gunshot wound to the back of Sabala's neck could have accounted for Sabala making such a noise.

**17** Santos knew Sabala had a yellow chickee in his pocket when he was killed, because she had bought chickees for her children to give to their cousins at an Easter event and had been present when her son gave one to Sabala. She did not know the chickee fell out onto the ground.

18.

message, and that she and her children were in danger. She told defendant he did not have to tell her anything, as she got the point.

Defendant left the apartment shortly after. Santos tried to talk to Gonzalez about the murder and if he knew it was going to happen, but he told her to leave it alone and stop asking questions. He did not seem upset about what had occurred. Santos did not know defendant was wanted for kidnapping at the time, and did not hear Gonzalez telephone the police to tell them where defendant might be found. That night, however, Gonzalez told Santos that if she was asked about Sabala's murder, to say they had dropped him off at The Commons and that was the last time they saw him. At some point, Santos and Gonzalez went to Atwater, where Gonzalez sold the murder weapon to a man he and Santos knew.

Santos subsequently learned from Gonzalez that defendant had been taken into custody by the Merced police the night he murdered Sabala. Two days later, she heard on the news that Sabala's body had been found. Detectives from the sheriff's department subsequently came to see Santos. She lied to them about her knowledge of the murder because she was afraid for herself and her children. Even though defendant was in custody, Santos was afraid of him and that he would get out, and Gonzalez said defendant probably had people watching them. Santos was prepared to go to prison, if necessary, to ensure her children's safety. Her drug use increased after the murder, and she continued to lie whenever questioned about the case.

Santos never spoke to defendant after the night of the murder. She never told him or anyone else that Gonzalez murdered Sabala. However, she heard from Gonzalez that defendant was telling people Gonzalez murdered Sabala.

Santos and Gonzalez continued dating for only a short time after the murder. Santos later learned Gonzalez had committed suicide. When she heard he was dead, she thought he might have been murdered and defendant might have had something to do

19.

with it. This made her more fearful for her own safety, and for the next several years, she continued to tell detectives she new nothing about Sabala's death.

In the 10 years following Sabala's murder, Santos continued to use drugs and went to jail numerous times. She was "clean" at the time of trial, however. In approximately July 2008, she was arrested for identity theft, drug possession, and bad checks, all crimes she committed in an effort to sustain her drug habit. Although some of the charges were felonies, she did not offer to tell what she knew about Sabala's murder in exchange for a deal. While she was in jail, Hale came to see her. She continued to deny any knowledge of or involvement in Sabala's murder.

Santos was convicted of the charges and, as a result, spent time in jail. At some point, however, she was offered the opportunity to get into drug court, an 18-month program that involves a minimum of three drug tests a week, a meeting every day, court every Friday, a weekly meeting with a counselor and with probation, and group meetings three times a week. This program offered Santos the chance to clear some of the things on her record, and she successfully completed it without ever having a dirty test.

In January 2009, Santos learned Hale was again trying to contact her. She agreed to an interview. She was not in custody and had no pending charges, although she was still in the drug program. At first, she again lied about the Sabala murder, but eventually told Hale what she testified to at trial.[18] She did so because part of the drug program is making amends to people the person has harmed or for wrongs the person has done, and this was a major one she felt needed to be resolved. Because of the passage of time and

---

[18] According to Hale, Santos told him that when she was off in the bushes at the wildlife refuge, she initially heard two shots. She also repeatedly said it was dark when the shooting occurred, which was why she did not see what defendant took from Sabala. A few days later, Santos drove around with Hale and another detective, pointing out various locations. Hale also showed her the "City Beat" video. Three days after that, Santos contacted Hale and, among other things, said she now remembered the shooting happened during the daytime.

her drug use, some of the details of what she told Hale were "a little sketchy." However, she remembered more things as time passed and she thought about events.

Raymond Framstad, a member of the Merced County Sheriff's Department assigned to the Merced Multi-Agency Narcotic Task Force as a drug agent, testified on rebuttal as an expert on methamphetamine use and recognition. Framstad explained methamphetamine is a central nervous system stimulant that creates a feeling of euphoria when taken. It is a highly addictive substance. Among other effects, methamphetamine causes longtime users to become very paranoid and delusional. Because methamphetamine is a long-term stimulant, users may be up for days at a time. They lose perception of time and sometimes even place. In Framstad's experience, the estimate of a habitual methamphetamine user as to what day of the week something happened likely would not be reliable. When someone stops using the drug, however, he or she will be able to get his or her life "back on track" after a while.

## II

### DEFENSE EVIDENCE

Warmsley was a friend of defendant and Sabala. On Tuesday, April 21, Warmsley and Sabala were driving to Atwater when Warmsley's car broke down. A police officer arrived; he had a camera operator with him. Eventually, Warmsley and Sabala were dropped off at Warmsley's residence and the car was towed to the shop. The last time Warmsley saw Sabala was when Sabala came by Warmsley's house around 2:00 Wednesday morning. Santos picked him up around then in a black Honda. Sabala got into the front passenger side of the car. There were some males sitting in the back seat. Warmsley did not know either of them. Sabala left with that group.

Warmsley denied helping defendant kidnap Reclosado. He was unaware of what was going on, because Reclosado was consoling defendant. Warmsley rented them a room, but would not have left Reclosado there had he felt she was in danger. She did not ask Warmsley for help, and defendant never had a gun. Warmsley never saw defendant

21.

strike her or any bruises on her face. Warmsley admitted being involved in the use of counterfeit money with defendant and Sabala.

In 1998, Sabala was Gregory's boyfriend. She did not know he was seeing other women. Gregory and defendant were good friends, but she was merely acquainted with Gonzalez.

Gregory last saw Sabala about 3:00 a.m. on Thursday, April 23. He came to her house to bring her some money in repayment of a loan she had made to him earlier in the month. Sabala said he was with Santos, Gonzalez, and another friend. Gregory did not know the identity of the fourth person.

Gregory next saw Santos and Gonzalez that afternoon. They were looking for Sabala. Gregory told them she had last seen him with them. They said they had dropped him off and had not seen him since, and were hoping he was at Gregory's house.

Gregory learned on Friday, April 24, that Sabala had been killed. A day or two later, she spoke to Detective Norris. When Norris asked what people were "saying on the streets," Gregory told her "fake money" and that defendant had done it. Norris asked if Gregory thought defendant was the perpetrator; Gregory responded no, because he was in jail. Gregory contacted Norris because people were coming by Gregory's house, and telephoning and threatening her and her daughter, that if Gregory told anybody anything, she and her daughter would be "taken care of."

Berumen was Sabala's niece. She last saw Sabala alive in the parking lot of a restaurant after dinner one night. She told Norris it was around 9:00 p.m. on April 21. Sabala was with Santos. Someone was in the back seat of the car. Berumen never knew who this person was.[19] She received threatening telephone calls from an unknown source or sources in the period following Sabala's murder.

---

**19** According to Santos, this encounter took place on April 20, the day before the killing. Berumen conceded this was possible. When she spoke to Norris on April 24, however, she said the encounter took place around 9:00 p.m. on April 21.

Sabala was staying with Berumen at the time of his death. At some point after he died, Berumen allowed Norris to go through Sabala's belongings. Norris found a note Sabala had written. It was dated April 14 and read, "I Ray Sabala went with Johnny Loco Man & Mike Gonzales to Turlock. I don't feel good about this one. I love you all aspecially you Desiree." (*Sic*.)

Snarski last saw Sabala alive around 11:00 p.m. on April 21. He came to her apartment to get high on methamphetamine with her and her roommate. Snarski had not used methamphetamine that day, as she was waiting for Sabala to bring her some of the substance. When he left, he told her to page him in half an hour. She subsequently paged him numerous times, but he never called back.

## DISCUSSION[20]

### I

### EVIDENTIARY RULINGS

**A.    Admission of Other-Crimes Evidence to Prove Motive**

Defendant contends the trial court erred by admitting evidence he kidnapped and battered Reclosado. He says the evidence had no tendency in reason to prove a motive for the killing of Sabala, and was unduly prejudicial. We disagree.

1.    Background

The prosecution moved, in limine, for admission of defendant's conduct toward Reclosado pursuant to Evidence Code section 1101, subdivision (b).[21] The prosecutor asserted the incident was relevant to the issue of motive, as one prosecution theory was that defendant murdered Sabala because he believed Sabala had been in a sexual relationship with Reclosado. The prosecutor further asserted the kidnapping evidence

---

**20**    There is overlap in some of the issues raised by defendant. Because of that and our desire to conform our discussion more closely to the chronology of events at trial, we address defendant's claims (including those alleging prosecutorial misconduct) in a different order than he has presented them in his opening brief.

**21**    Further statutory references are to the Evidence Code unless otherwise stated.

23.

was relevant to show defendant's willingness to use a firearm to accomplish his criminal goals. Defendant opposed admission of the incident, claiming the issue of motive was a collateral matter in light of defendant's alibi, and requesting a preliminary fact hearing under section 403 to determine whether the prosecution could prove, by a preponderance of the evidence, defendant was jealous of Sabala's connection with Reclosado. Defendant further contended the evidence should be excluded under section 352 because it was inflammatory, its relation to the charged crime was speculative, and whatever probative value it had was substantially outweighed by the potential for prejudice.

After argument on the issue, the court asked the parties to submit briefs explaining how the evidence of defendant's kidnapping of Reclosado tended to prove his motive to commit the murder charged in the present case. Defendant's brief focused on the lack of similarities between the proffered evidence and the present offense, and claimed the only nexus between the two was willingness to use a firearm. Defendant asserted the prosecution was simply attempting to introduce propensity evidence in violation of section 1101, subdivision (a). The People made an offer of proof that they intended to call Serena, who would testify defendant said he believed Sabala and Reclosado were having an affair, which upset defendant because Reclosado had been his girlfriend; defendant decided to kill them both for having the relationship; defendant took the first step toward that goal by kidnapping Reclosado with the intention of killing her; defendant changed his mind after kidnapping and assaulting Reclosado, and so let her go; and a few days later, defendant did kill Sabala due to Sabala's relationship with Reclosado. The People also represented they would offer Reclosado's testimony about her relationship with defendant and why he kidnapped and assaulted her.

The trial court determined it should exclude the proffered evidence only if the showing of preliminary facts was too weak to support a favorable determination by the jury. It found the preliminary fact of the commission of the kidnapping sufficiently established by defendant's conviction for that offense. It further found whether an

24.

intimate relationship existed between Sabala and Reclosado to involve the credibility of testimony or probative value of evidence — traditionally jury questions — and the evidence "sufficient to permit a jury to decide the question of credibility and weight of the evidence as to this issue."

In analyzing the issue under section 1101, the court found motive to be a relevant and material issue in the case, and that, while similarity of offenses was not always required when motive was at issue, there had to be a nexus between the prior crime and the charged offense. The court determined a sufficient nexus was established by the prosecution's theory that a few days before Sabala was killed, defendant kidnapped his then girlfriend, Reclosado, with the intent to harm or kill her because he believed she was involved in an intimate relationship with Sabala, and he intended to do the same to Sabala. The court found defendant's belief that a relationship existed between Sabala and Reclosado was at least part of defendant's motive for committing the charged murder. The court ruled, however, that evidence of defendant's kidnapping conviction had no relevance or nexus to the prosecution's theory defendant killed Sabala because he thought Sabala was stealing from him; hence, the prior crimes evidence was not admitted for that purpose. In addition, the evidence was not admitted to show defendant's willingness to use a firearm to accomplish his criminal goal, as such an inclination would constitute a propensity.

The court also conducted an analysis under section 352, and found the probative value of the evidence outweighed the probability its admission would create a serious danger of undue prejudice, confusing the issues, or misleading the jury. The court found a high degree of certainty of the crime's commission, since defendant was convicted of the offense; the evidence was relevant to material issues in the case; and the prejudicial impact not such that the evidence would evoke an emotional bias against defendant. The court noted the prejudicial impact of the jury being informed of defendant's prior conviction would be mitigated by defendant's alibi defense, as even absent admission of

25.

the prior crime evidence, the jury would be informed defendant had a prior arrest and had been in jail. Accordingly, the trial court granted the prosecution's motion to admit the evidence.

The testimony presented at trial concerning the Reclosado incident is set out in the statement of facts, *ante*. As summarized by the court, because the discussion was not reported, defense counsel questioned, during Reclosado's testimony, that testimony "as it pertained" to section 1101, subdivision (b). Counsel brought up the fact there was no mention of an affair with Sabala, whom Reclosado purported to barely know, or of defendant saying he would kill Sabala. The prosecutor responded that the testimony was consistent with the People's argument "permitting the 1101(b) evidence," and the court permitted the testimony to proceed.

2.    Analysis

We examine the trial court's determinations under sections 403, 1101, and 352 in that order. A trial court's resolution of the issues involved in determining admissibility under all three sections is reviewed for abuse of discretion. (*People v. Jones* (2013) 57 Cal.4th 899, 930 [§ 1101]; *People v. Carter* (2005) 36 Cal.4th 1114, 1149 [§ 352]; *People v. Lucas* (1995) 12 Cal.4th 415, 466 [§ 403].) "'A court abuses its discretion when its ruling "falls outside the bounds of reason." [Citation.]' [Citation.]" (*People v. Carter*, *supra*, at p. 1149.) In reviewing the trial court's determinations, we view the evidence in the light most favorable to that court's ruling. (*People v. Edwards* (2013) 57 Cal.4th 658, 711.)

Turning first to the trial court's preliminary fact determination, "[w]hen, as here, the relevance of proffered evidence depends upon the existence of a foundational fact, the proffered evidence is inadmissible unless the trial court determines it 'is sufficient to permit the jury to find the preliminary fact true by a preponderance of the evidence.'

26.

[Citations.]" (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; see § 403, subd. (a)(1).)[22] The preponderance standard is met if there is "sufficient evidence to enable a reasonable jury to conclude that it is more probable that the fact exists than that it does not. [Citations.]" (*People v. Herrera* (2000) 83 Cal.App.4th 46, 61.) The proponent of the evidence "has the burden of establishing all preliminary facts pertinent to determining the relevancy of that evidence. [Citation.] A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto .… [Citation.]" (*People v. Kaurish* (1990) 52 Cal.3d 648, 693.) "The court should exclude the proffered evidence only if the 'showing of preliminary facts is too weak to support a favorable determination by the jury.' [Citations.]" (*People v. Lucas*, *supra*, 12 Cal.4th at p. 466.)

In the present case, several preliminary facts had to be sufficiently established to make the proffered evidence relevant. The first two were the truth of the prior uncharged act and defendant's connection to it. (See *People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115.) As the trial court observed, these facts were sufficiently established by defendant's kidnapping conviction.

The third preliminary fact was defendant's belief Reclosado and Sabala were involved in an intimate relationship, or, as defendant framed it in seeking a preliminary fact hearing under section 403, that defendant was jealous of Reclosado's connection with Sabala. In light of the prosecutor's offer of proof with respect to Serena's

---

[22]    "The trial court has the preliminary, but not the final, authority to determine the question of the existence of the preliminary fact. Unlike in other situations [citations], … '[t]he preliminary fact questions listed in subdivision (a) [of … section 403] … are not finally decided by the judge because they have been traditionally regarded as jury questions. The questions involve the credibility of testimony or the probative value of evidence that is admitted on the ultimate issues. It is the jury's function to determine the effect and value of the evidence addressed to it.… [T]he judge's function on questions of this sort is merely to determine whether there is evidence sufficient to permit a jury to decide the question. The "question of admissibility … merges imperceptibly into the weight of the evidence, if admitted."' [Citation.]" (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 466-467.)

anticipated testimony, the trial court did not err by determining the evidence was sufficient to go to the jury. Accordingly, the trial court did not abuse its discretion under section 403.

We turn next to the court's determination the evidence was admissible under section 1101.**23** "Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) It is also admissible to prove the intermediate fact of motive. (*People v. Thompson* (1980) 27 Cal.3d 303, 319-320, fn. 23, disapproved on another ground in *People v. Rowland* (1992) 4 Cal.4th 238, 260.)

"'The admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy [such as section 352] requiring exclusion of the evidence.' [Citation.] Evidence may be excluded under … section 352 if its probative value is 'substantially outweighed by the probability that its admission would create

---

**23**     Section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 22-23.)

In the present case, evidence of the Reclosado kidnapping was offered on the issue of defendant's motive for killing Sabala. "When the commission of the criminal act by a defendant is a disputed issue in an action, evidence that tends to prove that the defendant had a motive for committing the criminal act is deemed relevant evidence. 'Motive' is itself a state-of-mind or state-of-emotion fact. Evidence that tends to prove 'motive' meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in conformity with his state of mind or emotion." (*People v. De La Plane* (1979) 88 Cal.App.3d 223, 246, italics omitted, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 39, fn. 25.) "[E]vidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable. 'Motive is not a matter whose existence the People must prove or whose nonexistence the defense must establish. [Citation.] Nonetheless, "[p]roof of the presence of motive is material as evidence tending to refute or support the presumption of innocence."' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 707, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "Although motive is not an element of … defendant's crime[], 'the absence of apparent motive may make proof of the essential elements less persuasive.'" (*People v. Davis* (2009) 46 Cal.4th 539, 604.)

"Other crimes evidence is admissible to establish two different types or categories of motive evidence. In the first category, 'the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect.' [Citation.] 'In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive.… [T]he motive is the cause, and both the charged and

uncharged acts are effects. *Both crimes are explainable as a result of the same motive.'* [Citation.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1381.) The other-crimes evidence in the present case falls into the latter category.[24] "California case law allows the admission of other crimes evidence to prove this second kind of motive. [Citations.]" (*People v. Spector*, *supra*, at pp. 1381-1382 & cases cited.)

Where evidence of uncharged crimes is proffered to prove identity, common design or plan, or intent, the charged and uncharged crimes must be sufficiently similar to support a rational inference of identity, common design or plan, or intent. (*People v. Kipp*, *supra*, 18 Cal.4th at p. 369.) However, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 15; see, e.g., *People v. Thompson*, *supra*, 27 Cal.3d at pp. 319-320, fn. 23; *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1018.)[25]

---

[24] *People v. Daniels* (1991) 52 Cal.3d 815 provides an example of the first category. In that case, the defendant committed a bank robbery in 1980. He fled in a car, pursued by two officers. When his car spun out of control, the defendant shot at one of the officers and ran. The officers fired, hitting the defendant and leaving him paralyzed below the waist. The defendant was convicted of various offenses, but posted bail pending appeal. In 1982, his conviction was affirmed. When he did not appear in court as scheduled, an arrest warrant was issued. Two police officers went to his location to arrest him, and the defendant shot and killed them, leading to capital charges. (*Id.* at pp. 837-838.) The California Supreme Court determined evidence of events surrounding the 1980 bank robbery was properly admitted in the capital case to show motive, as there was a direct relationship between the events surrounding the bank robbery, particularly the police shooting the defendant and rendering him a paraplegic, and the defendant murdering officers in retribution. (*Id.* at pp. 856-857.)

[25] In *People v. Walker* (2006) 139 Cal.App.4th 782, 804, the appellate court suggested similarity of offenses is not required with respect to the first category of motive evidence, i.e., where the motive for the charged crime arises from the commission of the prior offense, but that the offenses must share common features where the presence of the same motive in both instances may give rise to a finding of common plan or design. *Walker* was decided approximately two months before *People v. Demetrulias*, *supra*, 39 Cal.4th 1, and we question that portion of *Walker*'s analysis in light of *Demetrulias*'s discussion of the issue. (See *People v. Demetrulias*, *supra*, 39 Cal.4th at pp. 15-16.)

Here, particularly when Serena's testimony is considered, the requisite logical nexus existed between the charged and uncharged crimes: defendant's jealousy over what he perceived to be the relationship between Reclosado and Sabala, and his desire to punish them or for vengeance.

Defendant argues jealousy is a character trait and, in view of subdivision (a) of section 1101, evidence he acted jealously on a prior occasion is not admissible to prove he acted jealously in committing the charged offense. Whether jealousy might be deemed a character trait and inadmissible under section 1101, subdivision (a) in some factual settings is immaterial: Under section 1101, subdivision (b), "evidence of a person's prior bad act — evidence that might incidentally tend to show the person's disposition to commit such an act — is nevertheless admissible, if relevant, to raise an inference of (and hence prove) his motive … when he committed his crimes." (*People v. Jones*, *supra*, 57 Cal.4th at p. 952.) Jealousy has long been recognized as a motive (see, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 411-412; *People v. Weston* (1915) 169 Cal. 393, 396; *People v. Nazeri* (2010) 187 Cal.App.4th 1101, 1117; *People v. Mullen* (1953) 115 Cal.App.2d 340, 342-343) and, contrary to what we perceive to be defendant's argument, its use as such does not depend on the same person being the victim of both the charged and the uncharged offenses. "Antagonism or enmity between defendant and the victim of [an] assault is … relevant to the issue of defendant's identity as the assailant. Evidence of the interference of the assailed party with relationship between defendant and a third person, shown to have been desired by defendant, and known, from experience, to create passions of desire and of envy or jealousy is relevant to prove the motive of enmity. This is … the production of circumstantial evidence to show the motive. Those circumstantial facts are two,

31.

(1) defendant's affection for the third person; (2) the victim's interference with this affection." (*People v. Mullen*, *supra*, at p. 343.)**26**

Defendant says the fact he kidnapped and assaulted Reclosado is not evidence he had a motive to kill someone else. This ignores Serena's testimony. (See *People v. Roldan*, *supra*, 35 Cal.4th at p. 707 [evidence of prior robbery, in which security guard gave key evidence against defendant, properly admitted on issue of defendant's motive to kill, during course of current robbery, person he apparently believed was security guard; defendant's claim theory of motive unfounded and speculative rejected where other witness later testified defendant told her he killed victim to eliminate a witness to the crime].) Moreover — again contrary to defendant's claim — it at least partly corroborates Serena's testimony.

"As long as there is a direct relationship between the prior offense and an element of the charged offense, introduction of that evidence [of the prior offense] is proper. [Citations.]" (*People v. Daniels*, *supra*, 52 Cal.3d at p. 857.) In the present case, defendant "offered no concession which limited the issues, so the prosecution had the burden of proving all the elements of the [charged] crime." (*Id*. at p. 858.) "It is elementary, evidence of motive to commit an offense is evidence of the identity of the offender. [Citations.]" (*People v. Daniels* (1971) 16 Cal.App.3d 36, 46.) Defendant's identity as Sabala's killer was the primary issue in dispute in this case; hence, motive was highly material, particularly in light of the fact defendant and Sabala were friends or at least friendly toward one another. Evidence of the Reclosado kidnapping, taken together with Serena's testimony, provided strong evidence of motive.**27** In addition to its

**26**     We recognize that *People v. Weston*, *supra*, 169 Cal. 393 and *People v. Mullen*, *supra*, 115 Cal.App.2d 340, both predate adoption of the Evidence Code. Neither the cases cited by defendant nor those we have found suggest they no longer accurately state the law, however.

**27**     That Reclosado testified her altercation with defendant concerned someone other than Sabala does not change this conclusion. Serena testified defendant expressed jealousy of Reclosado's relationship with Sabala, and the existence of motive depended

relevance to the identity of Sabala's killer, motive was also relevant to the disputed issues of premeditation and deliberation (e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 862; *People v. Nazeri*, *supra*, 187 Cal.App.4th at p. 1117), although jurors ultimately found the murder was unpremeditated. Hence, the requisite direct relationship existed, and the trial court did not abuse its discretion in finding evidence of the kidnapping admissible under section 1101.

Finally, we examine whether the trial court abused its discretion in determining the probative value of the evidence outweighed its potential for undue prejudice. Again, we find no abuse of discretion.

"Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) "'"[H]ow much 'probative value' proffered evidence has depends upon the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality), and the necessity of proving the issue by means of this particular piece of evidence (degree of necessity)." [Citation.]' [Citation.] '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence [citations].' [Citation.]" (*People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375.)

In the present case, the challenged evidence was highly probative on the issue of motive, which in turn was a material issue in the case. Moreover, as the trial court observed, there was a high degree of certainty of the uncharged offense's commission because defendant was convicted of that offense.

---

on defendant's *belief*, not on the situation as it actually existed. Moreover, it was for the jury to determine the relative credibility of Reclosado and Serena.

Conversely, the evidence was not unduly prejudicial within the meaning of section 352. "'Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation].' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 824.) "'"The 'prejudice' referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against … [one party] as an individual and which has very little effect on the issues."'" [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 178, disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

Although disturbing, the testimony concerning the Reclosado kidnapping and assault was no stronger or more inflammatory than the testimony concerning the charged offense. (See *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 405.) Because jurors learned defendant had been convicted of the kidnapping, there was no danger they might seek to punish him for the uncharged offenses, regardless whether they considered him guilty of Sabala's murder. Moreover, there was little likelihood the Reclosado evidence would confuse the issues, because the jury did not have to determine whether the uncharged offenses occurred. (Cf. *ibid*.) And, even without the evidence, the jury would have learned defendant had a prior arrest and had been in jail and prison — indeed, his being in jail following his arrest for the kidnapping constituted the basis for his alibi defense. In addition, the trial court lessened any potential for prejudice by instructing jurors the evidence could only be considered for the purpose of deciding whether defendant had a motive to commit the charged offense, and that jurors were not to conclude from the evidence that defendant had a bad character or was disposed to commit crime. Jurors are

34.

presumed to have understood and followed this instruction.  (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1079.)[28]

Defendant contends admission of the evidence constituted federal constitutional error.  "Because the trial court did not abuse its discretion under state law in admitting this evidence over defendant's objections, his claim that the admission of this evidence violated his constitutional right to a fair trial … is without merit.  [Citation.]"  (*People v. Fuiava* (2012) 53 Cal.4th 622, 670.)[29]

## B.    Impeachment of Jamie Rodriguez

Defendant contends the trial court abused its discretion by prohibiting him from questioning Rodriguez on the charges she was actually facing at the time she testified,

---

[28]    Although defendant contends the trial court gave an erroneous instruction on other-crimes evidence, he does not challenge the foregoing portions of the instruction. We address his claims in part II of the Discussion, *post*.

[29]    Were we to conclude Reclosado's testimony was wrongly admitted, we would find the error one of state law only.  "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.  [Citations.]"  (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) "'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial."  [Citations.]  Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.'  [Citation.]" (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.)  Here, the uncharged crime was relevant to motive.  The details were no more inflammatory than testimony concerning the charged offense.  Even without evidence concerning the kidnapping, jurors would have learned defendant was in jail and then prison.  From the dates witnesses interviewed or otherwise had contact with defendant in prison, and the fact he was still in prison when arrested for killing Sabala, jurors reasonably could have inferred he received a long sentence and so was convicted of a serious crime, or he was convicted and incarcerated on multiple occasions.  In light of the other evidence against defendant, it is not reasonably probable he would have achieved a more favorable outcome had Reclosado's testimony been excluded.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [applying standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) to erroneous admission of evidence of the defendant's prior crimes].)

and instead only allowing those charges to be referenced generically. We conclude any error was harmless.

1. Background

Rodriguez's testimony is set out in the statement of facts, *ante*. Before she testified, defense counsel represented the prosecutor agreed evidence of Rodriguez's pending charges, together with her 2006 felony conviction for receiving stolen property, could be admitted.[30] Later, however, defense counsel stated he would be offering the pending charges "to show motivation rather than to impeach the witness by her prior bad acts." The following discussion subsequently took place:

> "[THE COURT:] And then as far as Ms. Rodriguez goes, as I understand it, there are … charges pending, an incident date of July 20, 2010, for Penal Code Section 211; 459, burglary; 236, dissuading a witness; 182, conspiracy; and 419, which I think is returning to a repossessed land. [¶] And you're indicating, [defense counsel], that you want to use it as motivation?

> "[DEFENSE COUNSEL]: Exactly, Your Honor.

> "THE COURT: Would you clarify that point on the record?

> "[DEFENSE COUNSEL]: Well, Your Honor, Ms. Rodriguez has spoken with detectives before. She's never made this claim before that my client admitted to shooting Ray Sabala. Her story … transpired within the last couple of weeks when Detective Hale went and spoke to her after she had been arrested for these crimes.…

> "THE COURT: And although this isn't dispositive, but it certainly would be helpful to me, do you have any authority that permits this use of charged crimes?

> "[DEFENSE COUNSEL]: I don't at hand, Your Honor. I can certainly get you that. [¶] … [¶]

> "[PROSECUTOR]: Well, it also raises, you know, Fifth Amendment issues such that she may need to be provided counsel. You

---

**30** Defense counsel ultimately elicited the prior conviction during cross-examination.

know, if he's going to talk to her about pending charges, anything —
[¶] … [¶] … — that she would say one way or the other is —

"THE COURT: Actually, the Fifth and Sixth Amendment.

"[PROSECUTOR]: Yes.

"THE COURT: … I have dealt with the issue before, but for a
different reason, and so that's why I'm trying to flesh out now whether
there is some authority wrapped around motivation, et cetera. And I don't
know the answer.… I'll certainly look into it.

"[DEFENSE COUNSEL]: I think as a general proposition,
motivation evidence is motivation to testify, especially to a late-breaking
story, would come in. I don't know of any specific case law or section of
the Evidence Code that keeps it out. But I guess we can talk about it
further tomorrow."

The next day, the court proposed to allow in the fact Rodriguez was presently in

custody on felony charges, but to exclude the nature of the charges. The court opined this

would permit the defense to address Rodriguez's motivation for testifying without raising

a Fifth or Sixth Amendment issue by requiring her to address the specific facts of the

charges. This ensued:

"[DEFENSE COUNSEL]: Your Honor, I would submit also that the
seriousness of the charges and the lengthy prison sentence she may be
looking at is —

"THE COURT: No, the Court is not going to go there on that. For
impeachment, the law is very clear on what can be used for impeachment
purposes. I think the Court's walking out on a plank by doing this, but I
think in doing a 352 analysis … the fact that there's been mention of it;
number 2, it's a prosecution witness, defense desires to get into a
motivation issue, what motivates her. Whether it's the fact that it's a felony
indicates by itself that it's a serious charge, and you can say several felony
charges and you can place into question the timing of her testimony as it
relates to the charges.

"As I understand it, there are pending currently and that her initial
contact and discussion to provide testimony is recent and timed with these
pending charges, some ten plus years later, and so I think defense gets what
it wants, maybe not to the degree you want but you get the motivation

37.

issue, and then the Court preserves and protects the 5th and 6th Amendment issues that are glaring in the face.

"[DEFENSE COUNSEL]: … I can ask her what she's been charged with and what she understands is going to happen to her if she is convicted of those without involving the 5th or 6th Amendment rights. I can tell her, look, I don't want you talking about whether you're guilty or not, I don't want you talking about any of the facts of the case. I think the seriousness of the charges — I mean, felony charges are one thing, multiple strike charges and a long prison sentence I think goes a long ways towards her motivation to come forward.

"THE COURT: You just generically indicate what it is. It's serious strike offenses, theft-related offenses. They're generic so it doesn't invoke any type of need for the defendant to talk about the facts requiring counsel to be appointed.

"[DEFENSE COUNSEL]: So if I understand you correctly, you're going to allow me to ask her whether or not she's —

"THE COURT: She is in custody, she has charges pending against her, and then you can delve into the timing of this, when did you first contact law enforcement? Was that after you were charged? I'll allow you to go into that area, but I'm not going to allow you to go into the specifics. I think that's treading on 5th and 6th Amendment issues, and I'm not going to go there.

"[PROSECUTOR]: Just for clarity purposes, Your Honor, [defense counsel] is going to be precluded from saying anything beyond words to the effect, Ms. Rodriguez, are you currently in custody on felony charges?

"THE COURT: Well, and he can also say that they're strike offenses. That's generic. That emphasizes the seriousness of it, but it doesn't have anything to do with the facts or what those strike charges are."

The prosecutor expressed concern over asking whether they were strike charges, since "a felony is a felony.…" Defense counsel pointed out this was not classic impeachment or character evidence being offered to impeach, but rather was being offered to show the witness's motivation. The court agreed and said that was why it was allowing a sanitized version, but not specific charges. It did, however, permit defense counsel to say "several" charges. Although both counsel expressed concern (the prosecutor because he believed jurors might think Rodriguez was pending murder or

38.

child molestation charges; defense counsel because he believed the particular charges were relevant to show the extent of her motivation, and jurors would not necessarily know what offenses constituted strikes), the court stood by its ruling.

On direct examination, the prosecutor elicited that the first time Rodriguez told anyone defendant murdered Sabala was during an interview conducted with Hale and the prosecutor at a local custodial facility. This took place:

"Q  And aren't you in custody right now, Ms. Rodriguez, for a theft-related offense where there are felony charges, some of which are even strikes?

"A  Yes.

"Q  Is that the reason that you told us that Ray Sabala was murdered by John Rivera?

"A  No.  [¶] … [¶]

"Q  Did I tell you during the interview that I couldn't talk to you at all about your current situation?

"A  Yes, you did.  [¶] … [¶]

"Q  Did I offer you anything in exchange for your testimony?

"A  No.

"Q  Had you previously spoken to Detective Hale about your knowledge of Ray Sabala's murder?

"A  Yeah.

"Q  Had you left out of your conversation with Detective Hale the information that the defendant had admitted to you that he had killed Ray Sabala?

"A  Yes, I did.

"Q  Why then, if you had kept this secret for 11 years, did you decide now two weeks ago, three weeks ago, to give us what is a very important piece of information?

"A  Because that's the right thing to do.

"Q  Well, wouldn't it be fair to suggest that maybe you were doing that because you hoped it might help you out with your current beef?

"A  Ain't nothing going to help me with my current beef."

During his opening argument, the prosecutor asserted Rodriguez (as well as Serena and Gomez) had possibly increased the risk of harm to themselves by what they had done in this case and had not received anything in return.  Defense counsel countered that Rodriguez had a reason to lie:  She was recently arrested "for serious felony multiple strike charges."  He asserted the issue was not that the district attorney's office had not made a deal with her; rather, the issue was whether she expected something.  Counsel argued Rodriguez testified she was afraid of defendant, and if that were so, he questioned why she would testify against defendant unless she thought she was going to get something out of it.  He urged jurors to look at the timing of her story that defendant confessed to her.

2.     Analysis

"Except as otherwise provided by statute, the … jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing, including …  [¶] … [¶]  (f) The existence or nonexistence of a bias, interest, or other motive."  (§ 780.)  Accordingly, "[a] party can offer evidence, by proffered extrinsic evidence or by cross-examination of a witness, to attack the credibility of a witness, if such evidence tends reasonably to establish that the witness has a motive to fabricate, or some other motive, that tends to cause the giving of untruthful testimony, even though there may be no reasonable basis for the existence of such a motive.  [Citations.]"  (*People v. Allen* (1978) 77 Cal.App.3d 924, 931, fn. omitted; accord, *People v. Brown* (2003) 31 Cal.4th 518, 544 [defendant entitled to explore whether witness offered inducements or expects benefits for testimony].)  "[T]he pendency of criminal charges is material to a witness' motivation in testifying even where no express 'promises of leniency or immunity' have been made.  During trial, defense counsel 'is permitted to inquire whether charges are pending against

40.

a witness as a circumstance tending to show that the witness may be seeking leniency through testifying. [Citations.]' [Citation.]" (*People v. Coyer* (1983) 142 Cal.App.3d 839, 842-843; accord, *People v. Martinez* (2002) 103 Cal.App.4th 1071, 1080 [prosecution witness can be impeached by "mere fact" of pending charges].) The witness's belief as to the criminal liability he or she faces may also be a proper subject of inquiry. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 94, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

"[W]ide latitude should be given to cross-examination designed to test the credibility of a prosecution witness in a criminal case. [Citation.]" (*People v. Cooper* (1991) 53 Cal.3d 771, 816 (*Cooper*).) Such latitude does not, however, "'prevent the trial court from imposing reasonable limits on defense counsel's inquiry based on concerns about harassment, confusion of the issues, or relevance' [citations]." (*People v. Brown*, *supra*, 31 Cal.4th at p. 545.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.) The same standard applies where the evidence was offered to show a witness's bias or motivation to testify. (See *People v. Freeman* (1994) 8 Cal.4th 450, 494-495; *People v. DeSantis* (1992) 2 Cal.4th 1198, 1226; *People v. Rummler* (1975) 44 Cal.App.3d 638, 647-648.)

The trial court erred to the extent it precluded defense counsel from asking Rodriguez what charges were pending against her and what criminal liability she believed she faced, based on fear of violating Rodriguez's constitutional rights. Because defense counsel sought to establish Rodriguez's bias and motivation for testifying, the mere existence of pending charges, not the circumstances of the alleged offenses or the truth of those charges, was what mattered. (Compare *People v. Suff* (2014) 58 Cal.4th 1013, 1065-1067 with *People v. Claxton* (1982) 129 Cal.App.3d 638, 661-662, overruled on

41.

another ground in *People v. Fuentes* (1998) 61 Cal.App.4th 956, 967 & fn. 10.) We fail to see how having Rodriguez list the charges themselves (which, as defendant notes, were a matter of public record) could have tended to incriminate her. Similarly, it was Rodriguez's understanding of the penalty she faced, not the actual state of the law, that was pertinent to her motivation. Defense counsel could have asked her belief without questioning its basis or inquiring as to Rodriguez's conversations with her attorney. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 278, overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638; *People v. Cornwell*, *supra*, 37 Cal.4th at p. 94.)

Nevertheless, the error "was harmless as a matter of state law because of the ample other evidence that came before the jury suggesting reasons to believe that [Rodriguez's claim defendant confessed to her] was not altruistic and that [her] testimony was the product of [her] hope to secure [assistance with her pending charges]." (*People v. Cornwell*, *supra*, 37 Cal.4th at p. 94.) The jury learned Rodriguez was facing multiple charges, some for serious offenses.[31] The matter of the timing of her claim defendant confessed was thoroughly explored by both counsel in their examination of Rodriguez, and defense counsel argued in summation that jurors should consider that timing and whether Rodriguez expected something in return for her testimony. (See *People v. Claxton*, *supra*, 129 Cal.App.3d at p. 662.)

The error did not rise to the level of a constitutional violation under the circumstances, however.

> "'[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise

---

[31] Defendant claims jurors cannot be expected to know the legal meaning or significance of the term "'strike.'" While jurors might not know the outer parameters of what constitute strike offenses, it is common knowledge such offenses are all serious. Thus, we reject any suggestion terming charges "strikes" fails adequately to convey the seriousness of those charges.

appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors … could appropriately draw inferences relating to the reliability of the witness."' (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 (*Van Arsdall*), quoting *Davis v. Alaska* (1974) 415 U.S. 308, 318.) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*Van Arsdall*, *supra*, 475 U.S. at pp. 678-679; see *Cooper*, *supra*, 53 Cal.3d at p. 817.) California law is in accord. (See *People v. Belmontes* (1988) 45 Cal.3d 744, 780[, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22].) Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall*, *supra*, 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. (*Cooper*, *supra*, 53 Cal.3d at p. 817.)" (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground in *People v. Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22; accord, e.g., *People v. Chatman* (2006) 38 Cal.4th 344, 372.)

"Defendant has the burden of demonstrating that a reasonable jury might have received a significantly different impression of [Rodriguez's] credibility had defense counsel been permitted to pursue his proposed lines of questioning. ([*Van Arsdall*], *supra*, 475 U.S. at p. 680.) In view of the extensive cross-examination of [Rodriguez] on topics relevant to [her] credibility, including [timing], defendant fails to carry that burden." (*People v. Williams* (1997) 16 Cal.4th 153, 207-208.) Thus, we do not believe defendant has stated a claim of error of federal constitutional magnitude, whether under the Sixth Amendment or the due process clause of the United States Constitution. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999.) In any event, for the reasons stated above, exclusion of evidence concerning the precise charges and sentence length Rodriguez faced was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); see *People v. Mickle* (1991) 54 Cal.3d 140, 169.) Defense counsel was able to conduct "searching cross-examination" concerning Rodriguez's timing and motives (*People v. Cornwell*, *supra*, 37 Cal.4th at p. 95), and

"[t]he jury was provided with an ample basis for doubting [Rodriguez's] veracity, without being informed" of the information defendant now claims jurors should have learned (*ibid*.).

## C.    **Impeachment and Questioning of Sheree Gregory**

Defendant contends the trial court erred by permitting the prosecutor improperly to impeach defense witness Gregory with drug use at irrelevant times, and to ask argumentative questions.[32]  We again conclude any error was harmless.

### 1.    Background

Gregory's testimony is set out in the statement of facts, *ante*.  Essentially, she testified she last saw Sabala, her boyfriend, around 3:00 a.m. on April 23, the day his body was found and after defendant was in custody for the Reclosado kidnapping.

Near the outset of the prosecutor's cross-examination of Gregory, the following took place:

> "Q.  And would it surprise you to learn that a forensic pathologist who conducted the autopsy on Mr. Sabala testified that he had been dead somewhere between 24 and 72 hours?

> "A.  No, I wasn't.  I never heard anything on that, sir.…

> "Q.  Well, if that were the case, it would make it impossible for you to have seen Ray Sabala at 3:00 in the morning on Thursday, wouldn't you agree?

> "[DEFENSE COUNSEL]:  Objection, Your Honor.  That's argumentative.  I mean, you know, first of all, … the pathologist's estimate was revised from 12 to 24 or 36 to 72.  Second of all, that's —

> "[PROSECUTOR]:  Your Honor, can we have a sidebar on this?  I don't need defense counsel testifying.

---

[32]    We will address defendant's related claim of prosecutorial misconduct in part III of the Discussion, *post*.

"THE COURT:  Actually, this is based on a premise.  And I think the way that the question is posed, the witness can answer it, and I think you can re-address it on direct.  So overruled.

"[PROSECUTOR]:  Q.  Would it be possible if a forensic pathologist, a doctor who conducts autopsies and examines bodies to determine the cause of death and makes estimates on the length of time that a body may have been dead, if that estimate was 24 to 72 hours —

"A.  Uh-huh.

"Q.  — is it possible that you could have seen Ray Sabala at 3:00 a.m. in the morning if he was found less than 10 hours later?

"A.  Well, that's — that's when I remember him coming by.  I was — I was sleeping when he came by, and that's — because I asked him what time it was, and he told me 3:00 in the morning.

"Q.  Okay.  Have you ever seen a dead body, Ms. Gregory?

"A.  No, I have not.  Not until these pictures.

"Q.  Well — and I'm sorry to have to show you these, but I'm going to show you one that's somewhat unpleasant.  I apologize.  [¶] … [¶] … Do you realize that these are maggots, et cetera, on Mr. Sabala's —

"A.  I guess so.

"Q.  Okay.  And that the pathologist testified that it takes a certain period of time, much longer than eight hours, for that sort of activity to be present on a person's body?

"A.  I guess.

"Q.  Okay.  Ms. Gregory, were you using methamphetamine at the time of Ray Sabala's murder?

"A.  No, I was not.  [¶] … [¶]

"Q.  When did you start using methamphetamine?

"A.  I had been using.  I was clean at the time.

"Q.  How long had you been clean?

"A.  For a month.  Because I was doing testing for my daughter.

45.

"Q. Okay. And how long had you been doing methamphetamine prior to the time that you got clean for a month?

"[DEFENSE COUNSEL]: Objection. Relevance.

"[PROSECUTOR]: It goes to her ability to perceive events, Your Honor.

"THE COURT: Overruled.

"THE WITNESS: About five years.

"[PROSECUTOR]: Q. All right. Were you a heavy user?

"A. I guess, yeah.

"Q. Okay. Were you shooting it or smoking it or snorting it?

"A. I smoked it.

"Q. Okay. When was — skipping ahead, when was the last time that you used methamphetamine?

"[DEFENSE COUNSEL]: Objection. Relevance.

"[PROSECUTOR]: I — it's a relevant point —

"THE COURT: No. I think it goes to credibility. It's overruled.

"THE WITNESS: Three years ago.

"[PROSECUTOR]: Q. Three years ago?

"A. I've been clean three years.

"Q. That was the last time you used methamphetamine?

"A. Yes, sir.

"Q. Are you aware you are under oath and you are testifying with perjury as a possible consequence of being untruthful? [¶] … [¶]

"A. Yes. I've used one time since the last three years. One time.

"Q. When was that?

"A. It was just a couple — I think a couple of months ago, I used one time.

46.

"Q. When was that?

"A. June, I think. I got stopped by the police .… [¶] … [¶]

"[PROSECUTOR]: Q. Did you tell the officers … that you had … smoked methamphetamine the morning before?

"A. Yes.

"Q. Did you tell the officers that you had been using methamphetamine on and off for approximately 12 years?

"A. On and off? No. I told them that I had been clean for the three years, and then I had just — I fell off the wagon.

"Q. Did you tell them you went a short period without using, but recently started smoking methamphetamine again?

"A. No. Just that one day I told them.

"Q. All right. Well, then how was it that you would be useful to them as a police informant?

"A. I have no idea, sir.

"Q. Didn't you offer to be a police informant?

"A. No. They asked me if I would, and I told them no .…
[¶] … [¶]

"Q. And is it your testimony that you in the last three years just used methamphetamine that one time —

"A. Yes.

"Q. — when you happened to be caught out on La Paloma Road?

"A. I wasn't using it that day. I had used it the day before.…
[¶] … [¶]

"Q. Okay. And did they find any paraphernalia with you?

"A. Yes, they did.

"Q. What did they find?

"A. They found a glass pipe.

47.

"Q. Okay. And what was that glass pipe for?

"A. Smoking methamphetamine. I forgot it was in my bag from the night before.

"Q. Isn't it true that you had been smoking methamphetamine for some time before May 2nd when you were out at La Paloma Road?

"A. No. Just that one day before.

"Q. So if the officers … wrote a report that you had recently started smoking methamphetamine again and you're telling them it was hard for you to stop, that's not true?

"A. That's — I never told them that.

"Q. And if … they broke down that you told them that you used approximately half a gram to one gram of methamphetamine every other day —

"A. No.

"Q. — that's not true?

"A. I never told them that. [¶] … [¶]

"Q. Okay. All right. Is it possible that your drug use problem now could be clouding your recollection of what happened 12 years ago?

"[DEFENSE COUNSEL]: Objection. Misstates the evidence.

"THE COURT: She can answer that question, though. So overruled.

"THE WITNESS: I don't think so. I don't think so. Because I'm not using now."

In rebuttal, the People presented the testimony of Merced County Sheriff's Deputy Orozco. He testified that he and another deputy were performing an "area check" on La Paloma Road on the night of May 3, 2010, when they contacted Gregory and a man in a vehicle. Gregory showed signs of controlled substance use and, when asked, admitted smoking methamphetamine with a pipe. In response to Orozco's questioning, Gregory related she had been using methamphetamine on and off for approximately 12 years, and

had last used it the previous day. Gregory said she used approximately half a gram to one gram every other day, and that she had gone a short period without using, but had started smoking again. At some point, Gregory asked to be a police informant in exchange for consideration on the fresh charge of paraphernalia possession.

As described in the statement of facts, *ante*, Framstad also testified on rebuttal. He usually did not regard people using methamphetamine with some regularity to be reliable in terms of estimating time or date. Users lose perception of time because methamphetamine is a long-term stimulant, and users may be up for several days in a row. The detachment from being tuned in to day, date, and time increases with the length of time someone has been using methamphetamine, and may get progressively worse, depending on their usage.

Framstad explained that methamphetamine is highly addictive. It changes a neurotransmitter, called dopamine, in a user's brain. The brain adapts to the methamphetamine use and makes the user crave the drug once the dopamine is no longer being released by the user's body. Thus, someone who uses methamphetamine will continue using it or quickly be addicted to it, in order to replace that chemical the body has stopped making. In terms of someone's ability to recreate his or her life once he or she stops using methamphetamine, Framstad testified, "[I]t takes a while. A lot of that is … because the body will be depleted of methamphetamine. Some of the chemicals will start to regenerate, and they're able to get back on track .…"

In his closing summation, the prosecutor talked about the defense witnesses. He asserted Gregory lied. He pointed to her testimony about her drug use, and also noted that she and Warmsley were at defendant's father's house on the day of Sabala's funeral. The prosecutor also argued there had been evidence the wildlife refuge did not open until just before sunup, so that if Gregory saw him at 3:00 a.m. the morning his body was found, his killers would have to have waited a couple of hours to get to the refuge. The prosecutor asked jurors to take a good look at the photographs of Sabala's body and keep

49.

in mind the pathologist's testimony, and he noted no one — not even defense counsel — had suggested the body had only been there for six or eight hours as would be the case under Gregory's testimony.

    2.    <u>Analysis</u>

        a.    *Argumentative Questions*

Defendant says the trial court erred by overruling his objection that the line of questioning concerning the pathologist's findings was argumentative.

"'An argumentative question is designed to engage a witness in argument rather than elicit facts within the witness's knowledge.' [Citation.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 435-436.) "An argumentative question is a speech to the jury masquerading as a question. The questioner is not seeking to elicit relevant testimony. Often it is apparent that the questioner does not even expect an answer. The question may, indeed, be unanswerable…. An argumentative question that essentially talks past the witness, and makes an argument to the jury, is improper because it does not seek to elicit relevant, competent testimony, or often any testimony at all." (*People v. Chatman*, *supra*, 38 Cal.4th at p. 384.)

We do not believe the first few questions were argumentative. Contrary to defendant's assertion, the questions did not call for Gregory to argue with the prosecutor about the pathologist's opinion, or to give her own opinion concerning the veracity or accuracy of his testimony or findings, nor did she do so. The final questions, which concerned insect activity on the body, are more problematic.[33] We need not decide whether they were argumentative and, accordingly, improper, however, because we discern no prejudice. The erroneous admission of evidence warrants reversal only if the evidence should have been excluded on the ground stated and it is reasonably probable a

---

[33]    Defendant arguably forfeited any claim of error by not objecting specifically to those questions. (See § 353.) In light of the trial court's earlier determination the line of questioning was proper, however, any objection may well have been futile.

result more favorable to the defendant would have been reached in the absence of the error. (*People v. Earp* (1999) 20 Cal.4th 826, 878; *People v. Whitson* (1998) 17 Cal.4th 229, 251; see *Watson*, *supra*, 46 Cal.2d at p. 836.) We see no reasonable probability defendant would have obtained a more favorable result in the absence of the questions about the insect activity — or, for that matter, had the line of questioning been excluded.

b. *Impeachment with Drug Use*

Defendant says the trial court erred by overruling his relevance objection to the inquiry into Gregory's drug use at times that were irrelevant to her testimony.

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under … section 352. [Citations.] [¶] '[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.'" (*People v. Clark* (2011) 52 Cal.4th 856, 931, fn. omitted.) Simple possession of drugs does not generally involve moral turpitude. (*People v. Vera* (1999) 69 Cal.App.4th 1100, 1103.) "Evidence of a witness's drug use is inadmissible unless the testimony 'tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 478; see *People v. Ortega* (1969) 2 Cal.App.3d 884, 902, overruled on another ground in *People v. Gainer* (1977) 19 Cal.3d 835, 846.) "Evidence of habitual narcotics … use is not admissible to impeach perception or memory unless there is expert testimony on the probable effect of such use on those faculties. [Citations.]" (*People v. Balderas* (1985) 41 Cal.3d 144, 191-192; accord, *People v. Wilson* (2008) 44 Cal.4th 758, 794.)

"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under … [section] 352. [Citations.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 230.) Relevant evidence is "evidence, including

evidence relevant to the credibility of a witness …, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) A trial court is vested with wide discretion in determining relevance, but has no discretion to admit irrelevant evidence. (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion [citations]." (*People v. Clark*, *supra*, 52 Cal.4th at p. 932.)

In light of Gregory's admission of heavy methamphetamine use for an extended period of time and Framstad's testimony, there was at least some relevance to the challenged questioning, even with respect to how recently she had used methamphetamine.[34] Because the line of questioning was permissible, Gregory's credibility in answering the questions put to her was placed at issue. That a determination of her credibility involved questions and answers concerning her drug use did not, under the circumstances, run afoul of the legal principles set out above.

"To determine the credibility of a witness, the trier of fact may consider, among other things, '[t]he existence or nonexistence of any fact testified to by' the witness. [Citation.] Although it is improper to elicit otherwise irrelevant testimony on cross-examination merely for the purpose of contradicting it [citation], the trial court has discretion to admit or exclude evidence offered for impeachment on a collateral matter [citations]." (*People v. Mayfield* (1997) 14 Cal.4th 668, 748; see § 780, subd. (i); *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)

In light of Framstad's testimony, we are not certain Gregory's most recent drug use and the extent thereof were truly collateral matters. We need not make this

---

[34]     We recognize, as defendant observes, that Framstad had not examined Gregory and had no personal information about her drug habits. We find his general testimony sufficient for relevance purposes, however.

determination, however, because the evidence was relevant under the circumstances of this case.**35**

Moreover, assuming the trial court permitted the prosecutor's cross-examination of Gregory to exceed the bounds of relevance and propriety, no basis appears for a reversal. Gregory's drug use at and around the time of Sabala's murder was clearly relevant, as were whether she was using drugs at or near the time she testified and whether her current drug use might be affecting her recollection of events. Her credibility was properly impeached with a theft conviction she suffered in 2000. Other witnesses besides Gregory told investigators shortly after Sabala's body was found, and/or testified at trial, that they saw Sabala alive after defendant was in jail. Not all these witnesses used methamphetamine. Under the circumstances, it is not reasonably probable a result more favorable to defendant would have been reached absent the error, if error it was. (See *People v. Williams* (1999) 72 Cal.App.4th 1460, 1465, fn. 8 [applying *Watson* standard to erroneous admission of impeachment evidence].)

## II

### JURY INSTRUCTIONS

Defendant raises several claims of error with respect to the instructions given (and not given) his jury. To the extent we find error occurred, we conclude it is not cause for reversal.

---

**35** To the extent the trial court may have erroneously believed a witness's drug use is *always* relevant to credibility, "'"[n]o rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion."' [Citation.]" (*People v. Brown* (2004) 33 Cal.4th 892, 901.)

## A.    <u>CALCRIM No. 375</u>

Defense counsel requested a limiting instruction regarding the jury's use of the other-crimes evidence, viz., the Reclosado kidnapping, and the trial court agreed to give CALCRIM No. 375.  Pursuant to that instruction, jurors were told:

> "The People presented evidence that the defendant committed the offense of kidnapping that was not charged in this case.  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the offense.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not the fact is true.  If the People have not met this burden, you must disregard this evidence entirely.

> "If you decide that the defendant committed the offense, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant had a motive to commit the offense alleged in this case.  Do not consider this evidence for any other purpose except for the limited purpose of defendant's motive.  Do not conclude from this evidence the defendant had a bad character or is disposed to commit crime.

> "If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of murder or that discharging a firearm causing great bodily injury and death had been proved.  The People must still prove the charge and every allegation beyond a reasonable doubt."

Defendant now contends the trial court erred by instructing jurors to find an incorrect preliminary fact, and not instructing them to disregard the other-crimes evidence unless they found the preliminary fact existed.  We agree error occurred, but find it harmless.[36]

---

[36]    The Attorney General says defendant forfeited any claim of incorrect preliminary fact by failing to object to the giving of CALCRIM No. 375.  It is true that "[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.  [Citations.]" (*People v. Lee*

54.

As previously discussed, evidence of the Reclosado kidnapping was admitted for a limited purpose. Accordingly, upon defendant's request, the trial court properly gave a limiting instruction. (See § 355.) As also recognized *ante*, however, the relevance of that evidence depended on the existence of foundational facts. Where, as here, the court admits such evidence under section 403, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (§ 403, subd. (c)(1).)

"Under the Evidence Code, the truth of the prior uncharged act and defendant's connection to it are preliminary factual issues which must be decided before the prior misconduct can be deemed admissible; if the prior and defendant's connection to it are not established by a preponderance of the evidence, the prior is irrelevant to prove the … section 1101[, subdivision ](b) fact for which it is being offered. [Citations.]" (*People v. Garelick*, *supra*, 161 Cal.App.4th at p. 1115.) Thus, the trial court did not err by telling

_____

(2011) 51 Cal.4th 620, 638; see *People v. Lang* (1989) 49 Cal.3d 991, 1024.) To the extent defendant is claiming the instruction was erroneous, however, his claims are reviewable under Penal Code section 1259. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 475.) Accordingly, we decline to find forfeiture of the issue.

Defendant suggests that because the disputed preliminary fact did not materialize at trial, the trial court had a sua sponte duty to instruct the jury to disregard the other-crimes evidence. Section 403, subdivision (c)(2) says the court "[s]hall instruct the jury to disregard the proffered evidence if the court subsequently [i.e., after admitting the evidence under section 403] determines that a jury could not reasonably find that the preliminary fact exists." Defendant's premise is faulty, because, as we have explained, *ante*, the disputed preliminary fact did indeed sufficiently materialize at trial. (See *People v. Lewis* (2001) 26 Cal.4th 334, 362-363.)

Defendant also says his trial attorney was ineffective for requesting, in his response to the People's in limine motion to admit the evidence, that the court instruct the jury to disregard the evidence unless it found a preponderance of the evidence established the preliminary fact existed, but failing to renew this request when instructions were settled at the instruction conference. Because the Attorney General does not claim the issue was forfeited by defense counsel's failure to renew his request, we will reach the merits of defendant's claim rather than dealing with the issue under the rubric of ineffective assistance of counsel.

55.

jurors they could only consider the uncharged kidnapping if they found the People proved, by a preponderance of the evidence, that defendant committed the offense.

However, the instruction given omitted the other preliminary fact that had to be found before jurors properly could consider the kidnapping evidence: Defendant's belief Reclosado and Sabala were involved in an intimate relationship, or, as defendant framed it, that defendant was jealous of Reclosado's connection with Sabala. Although, as we have determined, the evidence was sufficient to establish this preliminary fact by a preponderance, it was not such (unlike the fact of the kidnapping and defendant's commission thereof) that jurors *necessarily* had to conclude it existed. Accordingly, the trial court erred by failing to instruct jurors they could consider the evidence only if the People sufficiently proved this preliminary fact, and to disregard the evidence if the People did not meet their burden. (See *People v. Lucas*, *supra*, 12 Cal.4th at pp. 467-468; *People v. Lebell* (1979) 89 Cal.App.3d 772, 779.)

Nevertheless, we see no reasonable probability the jury would have reached a result more favorable to defendant had the instruction included the foregoing points. (See *People v. Jones* (2012) 54 Cal.4th 1, 53; *People v. Carpenter* (1997) 15 Cal.4th 312, 393, abrogated on another ground in *People v. Diaz* (2015) ___ Cal.4th ___ [2015 Cal.Lexis 1805, *23], superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107; *People v. Lucas*, *supra*, 12 Cal.4th at p. 468.) Jurors were told they could only use the kidnapping evidence in deciding whether defendant had a motive to commit the charged offense. If they did not conclude defendant believed Reclosado and Sabala were involved in an intimate relationship or that defendant was jealous of Reclosado's connection with Sabala, it follows they would not use the evidence as showing defendant's motive to kill Sabala and, because they were told they could only use it for that purpose, would disregard it even without expressly being told to do so. (See *People v. Jones*, *supra*, 57 Cal.4th at p. 934; *People v. Lucas*, *supra*, 12 Cal.4th at p. 468.)

Defendant takes issue with this reasoning, and argues that even if jurors believed the kidnapping was committed because defendant was jealous of Reclosado and someone other than Sabala, they could have misused the kidnapping evidence to conclude defendant is a "violently jealous person by nature," which in turn would make it easier for them to credit Serena's claim defendant killed Sabala because he was jealous. Defendant says CALCRIM No. 375, as given, "did not tell jurors that the kidnapping incident could not be used simply to find that [defendant] is a violently jealous type of person. Although the instruction did state that the other-crime evidence could not be used generally to show 'bad character' or that [defendant] is 'disposed to commit crime,' it also stated that such evidence could be used to establish 'motive,' which gave the jury the impression that character and disposition evidence could be considered, as long as it was linked to the issue of motive."

We reject defendant's contention. It is axiomatic that "[j]urors are presumed to understand and follow the court's instructions. [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 662.) "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 380-381.) This is especially true here, where "any theoretical possibility of confusion was diminished by the parties' closing arguments …." (*People v. Garceau*, *supra*, 6 Cal.4th at p. 189.) Those arguments clearly focused on defendant's belief (or lack of belief) Sabala had an intimate relationship with Reclosado.[37]

---

[37] *People v. Simon* (1986) 184 Cal.App.3d 125 (*Simon*) is factually and legally distinguishable. In that case, the defendant shot and killed Soto at the apartment of the defendant's girlfriend. Charged with second degree murder, the defendant admitted shooting Soto, but claimed he did so in self-defense. (*Id*. at p. 127.) Over defense objection, the prosecutor was permitted to introduce evidence of a prior incident in which

## B.      <u>Instructions Relating to Alibi</u>

Sabala's body was found on April 23, 1998.  The prosecution presented evidence he was killed 24 to 72 hours earlier.  The evidence was undisputed that the "City Beat" video showed Sabala alive shortly before 2:00 p.m. on April 21, 1998, and that defendant was arrested in connection with the Reclosado kidnapping at approximately 9:00 p.m. that same day.  Thus, as defendant says, in order to prove he was the killer, the People had to prove the killing took place between 2:00 p.m. and 9:00 p.m. on April 21, 1998.[38]

---

the defendant pulled a gun on another man he found at the girlfriend's apartment.  In that incident, the defendant claimed he was trying to help his girlfriend with her drug problem and was enraged that the other man was selling drugs to her.  The prosecution's theory was that the defendant had accused his girlfriend and the man of having a sexual relationship, and had grown angry and pulled the gun on the man as a result.  (*Id*. at pp. 128-129.)  Although the defendant's motive in committing the prior assault was a "critical" preliminary factual issue that had to be resolved before evidence of that incident could be deemed admissible, the trial court made no preliminary finding on the sufficiency of the evidence, and the jury was never instructed, consistent with section 403, subdivisions (a) and (c)(1).  (*Simon*, *supra*, at pp. 130-131.)  Although the trial court instructed the jury that evidence of the prior incident was admitted for the limited purpose of demonstrating the defendant's intent and motive, the appellate court found the instruction confusing because it failed to acknowledge the disputed factual issue, and so suggested evidence of the prior incident was probative of the defendant's intent and motive regardless of which version of the facts the jury accepted.  (*Id*. at p. 131.)  The reviewing court found the instruction "doubly confusing" because, even if the People's version were accepted, the prior incident did not demonstrate the defendant's intent or motive but merely tended to negate his claim of self-defense.  (*Ibid*.)  As a result, the Court of Appeal reversed the judgment "to give [the defendant] the benefit of a trial court evaluation of the sufficiency of the evidence indicating that he [committed the prior assault] for jealous motives.  If the trial court determines that such evidence would be sufficient to support a jury finding that the incident occurred in the manner alleged by the People, [the defendant] is entitled to a jury properly instructed on the preliminary fact it must find in order to even consider the prior act evidence and on the purpose for which such evidence may be considered."  (*Id*. at p. 132.)

The case before us does not present the same multiplicity of errors, nor do we find the instruction given to be misleading under the circumstances.  Accordingly, *Simon* does not require reversal.

[38]      Based on the pathologist's estimate of the time of death, the Attorney General says the prosecution had to prove Sabala died between 1:00 p.m. on April 20, 1998, and

Defendant's principal defense at trial was one of alibi, and he relied on witnesses who testified to seeing Sabala alive after defendant was in custody.[39] Defendant now contends CALCRIM Nos. 207 (Proof Need Not Show Actual Date) and 302 (Evaluating Conflicting Evidence) diluted the People's burden of proof in light of that defense. He also contends trial counsel was ineffective for failing to object to either instruction, and for failing to request an instruction on alibi. We address each claim in turn, keeping in mind certain legal principles.[40]

"What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, [citations], and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements, [citations]." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277-278; see *In re Winship* (1970) 397 U.S. 358, 364.)

A jury instruction violates due process if it "fails to give effect" to the requirement that the prosecution prove every element of the offense. (*Middleton v. McNeil* (2004) 541 U.S. 433, 437.) "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is '"whether

---

9:00 p.m. on April 21, 1998, to prove defendant committed the murder. Although this does not particularly change the thrust of the People's argument on appeal, it overlooks the fact the People could not have proven Sabala died prior to the afternoon of April 21, 1998.

[39] We recognize alibi is not, strictly speaking, a separate or affirmative defense. (*People v. Freeman* (1978) 22 Cal.3d 434, 438; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, § 3, p. 429.) Nevertheless, we refer to it as a defense, as do many of the cases.

[40] We reject the suggestion defendant forfeited any claim of error with respect to the instructions given by failing to object thereto at trial. Notwithstanding the lack of objection, defendant's claims are cognizable on appeal to the extent they implicate his substantial rights. (Pen. Code, § 1259; *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12; *People v. Carey* (2007) 41 Cal.4th 109, 129.)

the ailing instruction … so infected the entire trial that the resulting conviction violates due process.'" [Citation.]" (*Ibid*.; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

When reviewing assertedly erroneous instructions, "'"we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' [Citations.] "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" [Citation.] The reviewing court also must consider the arguments of counsel in assessing the probable impact of the instruction on the jury. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1202; accord, *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72; *Boyde v. California*, *supra*, 494 U.S. at p. 380; *People v. Rogers*, *supra*, 39 Cal.4th at p. 873; see *Weeks v. Angelone* (2000) 528 U.S. 225, 236.)

1.    CALCRIM No. 207

As filed, the information charged defendant with murdering Sabala on or about April 23, 1998. Near the outset of trial, the court permitted the prosecutor to amend the information to reflect the date of April 21, 1998. In his opening statement, the prosecutor told the jury time of death was a "crucial factor" in the case; Sabala was seen on the video around 2:00 p.m. on April 21, 1998; and defendant was taken into custody around 9:00 that night. The prosecutor expressed his belief the evidence would show the murder occurred within that timeframe.

At the conclusion of evidence, the trial court instructed the jury, without objection, in the language of CALCRIM No. 207, to wit: "It is alleged that the crime occurred on April 21st, 1998. The People are not required to prove that the crime took place exactly on that day, but only that it happened reasonably close to that day."

Defendant now contends CALCRIM No. 207 reduced the People's burden of proving the killing occurred before the time defendant was arrested in the Reclosado matter. Because he was relying on an alibi defense, he reasons, the instruction denied him due process. We conclude the error was harmless.

60.

The Bench Notes to CALCRIM No. 207 state, in pertinent part: "This instruction should not be given … when the evidence demonstrates that the offense was committed at a specific time and place and the defendant has presented a defense of alibi or lack of opportunity .…" "'This … accurately recognizes the rule as developed by the courts.' [Citation.] 'Ordinarily, the People need not plead the exact time of commission of an alleged offense. [Citation.] However, if the defense is alibi … the exact time of commission becomes critically relevant to the maintenance of the defense. An instruction which deflects the jury's attention from temporal detail may unconstitutionally impede the defense.' [Citation.]" (*People v. Richardson* (2008) 43 Cal.4th 959, 1027; see *People v. Wrigley* (1968) 69 Cal.2d 149, 155-156 & cases cited.)**41**

Had the only evidence concerning time of death been the pathologist's estimate thereof, CALCRIM No. 207 would have been properly given since defendant presented only a partial alibi for his whereabouts during that time period. (See *People v. Richardson*, *supra*, 43 Cal.4th at pp. 1027-1028.) Because the evidence conclusively proved Sabala was killed sometime after 2:00 p.m. on April 21, 1998, and could not have been killed by defendant if he were killed after 9:00 that night, however, the time of the offense was clearly material even though the factual scenario may not have presented the usual alibi situation. To convict defendant of Sabala's murder, the People had to prove Sabala was killed within that precise timeframe. The time the offense was committed thus "became material, and it was the duty of the trial court to limit the jury in its consideration of the evidence to the period which the prosecution selected as the time of commission of the offense[]. [Citation.]" (*People v. Waits* (1936) 18 Cal.App.2d 20,

---

**41** The cases cited in this portion of our discussion construe CALJIC No. 4.71, CALCRIM No. 207's counterpart. CALJIC No. 4.71 provides: "When, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if you find that the crime was committed, it is not necessary that the proof show that it was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date." For our purposes, there is no practical difference between the instructions.

21.) CALCRIM No. 207 should not have been given. (*People v. Jones* (1973) 9 Cal.3d 546, 556-557, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 & *Hernandez v. Municipal Court* (1989) 49 Cal.3d 713, 719, 729.)

The error was clearly harmless beyond a reasonable doubt, however. (*Chapman*, *supra*, 386 U.S. at p. 24; see *People v. Seabourn* (1992) 9 Cal.App.4th 187, 194.) Jurors were fully instructed on the People's burden of proving defendant guilty beyond a reasonable doubt. The prosecutor argued to the jury that the killing took place between approximately 2:00 p.m. and 9:00 p.m. on April 21, 1998. Defense counsel also argued that timeframe and asserted that, because Sabala was seen alive after defendant's arrest for the Reclosado kidnapping, defendant could not be the killer. There was neither evidence nor argument suggesting the jury could find Sabala was killed outside that timeframe and still convict defendant of killing him. Under the circumstances, there is *no* likelihood — let alone a reasonable one — jurors were misled or the defense impeded.

2.      CALCRIM No. 302

As described in the statement of acts, *ante*, Santos testified defendant killed Sabala on the afternoon or early evening of April 21, 1998. The defense presented witnesses who testified to seeing Sabala alive after defendant was taken into custody for kidnapping Reclosado. Without objection, the trial court instructed the jury in the language of CALCRIM No. 302, to wit:

> "If you determine there is a conflict in the evidence, you must decide what evidence, if any, *to believe*. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or desire to favor one side or the other. What is important is whether the testimony or any other evidence *convinces you*, not just the number of witnesses who testified about a certain point." (Italics added.)

Defendant contends that when applied to a conflict in evidence raised by third-party culpability or other exculpatory evidence, the instruction unconstitutionally dilutes the prosecution's burden of proof. He argues the requirement of proof beyond a

62.

reasonable doubt "means that when there is a conflict in the evidence between inculpatory evidence and exculpatory evidence, the jury may resolve the conflict only if it is convinced that the inculpatory evidence is true beyond a reasonable doubt and that the exculpatory evidence is false beyond a reasonable doubt. If there is a reasonable possibility that the exculpatory evidence could possibly be true, the defendant is entitled to an acquittal." He says CALCRIM No. 302 does not convey this concept and that, while the emphasized language may be correct when applied to inculpatory evidence, it is incorrect when applied to exculpatory evidence arising from evidence of alibi or lack of opportunity, which need only raise a reasonable doubt as to the defendant's guilt. He recognizes the California Supreme Court has upheld CALJIC No. 2.22, CALCRIM No. 302's counterpart, against constitutional challenges (e.g., *People v. Jones*, *supra*, 57 Cal.4th at pp. 972-973; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1356; see *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884-885), but contends that instruction is worded sufficiently differently so that those cases do not apply to CALCRIM No. 302.[42] We find no error.

"A trial court must instruct the jury on the allocation and weight of the burden of proof [citations], and, of course, must do so correctly." (*People v. Mower* (2002) 28 Cal.4th 457, 483.) Because the Constitution requires that the prosecution prove a defendant's guilt beyond a reasonable doubt, the exculpatory testimony of a witness need only raise a reasonable doubt in the minds of the jury. (See *Cool v. United States* (1972) 409 U.S. 100, 104.) This is true of alibi evidence. (*People v. Mower*, *supra*, 28 Cal.4th

---

[42] CALJIC No. 2.22 provides: "You are not required to decide any issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which you find more convincing. You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other. You must not decide an issue by the simple process of counting the number of witnesses [who have testified on the opposing sides]. The final test is not in the [relative] number of witnesses, but in the convincing force of the evidence."

at p. 479 & fn. 7; *People v. Wrigley*, *supra*, 69 Cal.2d at p. 159.)  "If the defendant introduces evidence of an alibi which is sufficient to create a reasonable doubt in the minds of the jury and it does create such a doubt, he is entitled to a verdict of acquittal. Thus, where the evidence of alibi conflicts with the evidence connecting the defendant with the crime and an instruction is given which deprives the jury of its freedom of judgment on the weight to be accorded alibi evidence, or on the credibility of witnesses testifying to the facts of alibi, error is committed which is prejudicial to the defendant's rights.  A suggestion may not be made to the jury that an alibi must be proved by a preponderance of the evidence, or that alibi evidence must satisfy the jury of the defendant's innocence, or that the jury must give less credit to testimony of alibi witnesses, or more careful scrutiny or less weight to alibi than to other evidence in the case."  (*People v. Costello* (1943) 21 Cal.2d 760, 765-766.)

When CALCRIM No. 302 is read in isolation, it is theoretically possible to interpret the italicized portions as defendant contends.  "However, we review an assertedly erroneous instruction not in isolation, but in the context of the entire charge. [Citation.]"  (*People v. Johnson* (1992) 3 Cal.4th 1183, 1250.)  Here, jurors were instructed that "[b]ecause he is presumed innocent, the defendant does not have to prove that he is not guilty."  They were fully instructed on the presumption of innocence, that it required the People to prove defendant guilty beyond a reasonable doubt, and that when they were instructed the People must prove something, this meant they must prove it beyond a reasonable doubt.  Jurors were instructed to consider all the evidence received *throughout the entire trial*, and that unless it proved defendant guilty beyond a reasonable doubt, he was entitled to an acquittal.  They were further instructed the People had to prove defendant "did the act charged .…"  In conjunction with the corpus delicti instruction, jurors again were told, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."  In addition, defense counsel noted in

64.

his closing argument that the prosecution had to prove beyond a reasonable doubt that defendant was guilty, and that the defense did not have to prove anything.

Considered in context of the instructions as a whole, we find no reasonable likelihood the jury applied CALCRIM No. 302 in a way that violates the Constitution. (See *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72; *People v. Frye*, *supra*, 18 Cal.4th at p. 957.)

### 3. Failure to Request Alibi Instruction

Despite the fact defendant relied primarily on an alibi defense, the trial court did not specifically instruct on alibi. Omitting the third paragraph, which applies where aider and abettor and/or coconspirator liability is alleged, CALCRIM No. 3400 would have told jurors:

> "The People must prove that the defendant committed ___ <*insert crime[s] charged*>. The defendant contends (he/she) did not commit (this/these) crime[s] and that (he/she) was somewhere else when the crime[s] (was/were) committed. The People must prove that the defendant was present and committed the crime[s] with which (he/she) is charged. The defendant does not need to prove (he/she) was elsewhere at the time of the crime.

> "If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find (him/her) not guilty."

The trial court was not required to give an alibi instruction on its own motion. (*People v. Alcala* (1992) 4 Cal.4th 742, 803-804; *People v. Freeman*, *supra*, 22 Cal.3d at pp. 437-438.) Defendant implicitly recognizes this, but claims trial counsel was ineffective for failing to request an instruction that conveyed the principles embodied in the first two paragraphs of CALCRIM No. 3400.[43] We disagree.

---

**43** Defendant also contends trial counsel was ineffective for failing to object to CALCRIM Nos. 207 and 302. Because we have addressed, on the merits, defendant's claims those instructions were erroneously given, we need not undertake what would amount to a redundant discussion under the classification of ineffective assistance of counsel.

The burden of proving ineffective assistance of counsel is on defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.)

Although defense counsel reasonably could have asked the court to give CALCRIM No. 3400, defendant fails to establish either deficient performance or prejudice based on his failure to do so. As previously described, the jury was fully instructed on the prosecution's burden of proof and that unless the evidence proved defendant guilty beyond a reasonable doubt, he was entitled to an acquittal. Where alibi is concerned, these instructions are sufficient. (*People v. Alcala*, *supra*, 4 Cal.4th at p. 804; see *People v. Whitson* (1944) 25 Cal.2d 593, 604.) As the California Supreme Court has observed, "In the present case, … the jury was instructed to acquit defendant if the prosecution failed to establish his guilt beyond a reasonable doubt. It would have been redundant to have required an additional instruction which directed the jury to acquit if a reasonable doubt existed regarding defendant's presence during the crime.… [N]o juror could possibly be misled by the failure to instruct on the significance of defendant's alibi defense." (*People v. Freeman*, *supra*, 22 Cal.3d at p. 438.)

66.

# III

## PROSECUTORIAL MISCONDUCT

Defendant claims the prosecutor committed misconduct on multiple occasions. The applicable legal principles are settled. "When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury. [Citation.]" (*People v. Panah*, *supra*, 35 Cal.4th at p. 462.) Misconduct under state law is reversible only if "'"it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct"' [citation]." (*People v. Martinez* (2010) 47 Cal.4th 911, 955-956.) When the claim of misconduct is based on the prosecutor's comments before the jury, "'"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 121.)

"'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]" (*People v. Nunez and Satele* (2013) 57 Cal.4th 1, 31.) "There are two exceptions to this forfeiture: (1) the objection and/or the request for an admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. Forfeiture for failure to request an admonition will also not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition. A defendant claiming that one of these exceptions applies must find support

for his or her claim in the record.  [Citation.]  The ritual incantation that an exception applies is not enough." (*People v. Panah*, *supra*, 35 Cal.4th at p. 462.)

When a defendant has preserved the issue, "the reviewing court must determine first whether misconduct has occurred, keeping in mind that '"[t]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom"' [citation], and that the prosecutor 'may "vigorously argue his case" …, "[using] appropriate epithets warranted by the evidence."' [Citation.]  Second, if misconduct ha[s] occurred, we determine whether" it was prejudicial under the applicable standard.  (*People v. Welch* (1999) 20 Cal.4th 701, 752-753.)

"A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.  The appellate record, however, rarely shows that the failure to object was the result of counsel's incompetence; generally, such claims are more appropriately litigated on habeas corpus, which allows for an evidentiary hearing where the reasons for defense counsel's actions or omissions can be explored.  [Citation.]" (*People v. Lopez* (2008) 42 Cal.4th 960, 966.)  "'Unless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.]  If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." [Citations.]'" (*Ibid*.)

With these principles in mind, we examine the complained-of questions and remarks in context.  Although we find some instances of prosecutorial error, we conclude there was no violation of due process or cause for reversal under state law, whether those

instances are considered singly or cumulatively. Nor has defendant established ineffective assistance of counsel on appeal.

## A.      Offering and Arguing Evidence Defendant Admitted Attempted Murders

In his opening statement, the prosecutor told the jury, without objection:

"In an interview with Detective Hale, the defendant denies he's a killer and says he never killed anyone although he admits to having, quote, stabbed some mother-fuckers up real good, end quote, back in prison, and admits to having had, quote, the intention to kill the mother-fucker, end quote. Excuse me. But in the letter he wrote February 9th, 2009 from prison to a woman named Denise M[a]ncha, the defendant tells a different story. He talks about religion and forgiveness and expresses his concern that he won't be forgiven. Why? Because he tells her, quote, I've killed, Denise, end quote. The letter doesn't say who he's killed."

The prosecutor examined Hale concerning his interviews with defendant. Hale testified about the contents of defendant's letter to Mancha, and that defendant acknowledged having written the letter. After Hale testified about other statements defendant made, this occurred:

"Q Did you ask the defendant if he had ever killed before?

"A I did.

"Q What did the defendant tell you?

"A He said he hadn't killed anybody before. He said he had stabbed some people before with the intention of killing them.

"[DEFENSE COUNSEL]: I'm going to object and move to strike. What's the relevance of this?

"THE COURT: [Prosecutor]?

"[PROSECUTOR]: Your Honor, it goes to inconsistencies with the defendant's statement. The defendant had testified that he never killed before and that he wasn't a murderer, and in the same breath admits he attempted to kill somebody. It goes to the defendant's credibility, his previous statement.

"[DEFENSE COUNSEL]: When did he say —

69.

"THE COURT: Sustained. The Court is going to sustain the objection.

"[PROSECUTOR]: [¶] Q Did the defendant's statement to you that he had never killed before contradict the statement he had made in the letter to Denise Mancha?

"A It did."

During his argument to the jury, the prosecutor stated, without objection: "The defendant, by his own proud admissions, is a scary, manipulative, and threatening man.… [¶] You've heard evidence that he's a drug user, a counterfeiter, a liar, that he's tried to stab people to death, that he bragged about his efforts to manipulate law enforcement, and revels in his reputation as 'Loco Man.' And you've heard that he has admitted to killing before." The prosecutor later discussed Serena's testimony that defendant killed Sabala because Sabala was sleeping with Reclosado. In part, the prosecutor stated:

"Doesn't that sound exactly like the self-important egotist, self-acknowledged egotist that you've heard described by himself and by others throughout this trial? His ego couldn't allow someone else to live who had disrespected him in that way. And we know from the defendant's own statements, his own statements to Detective Hale, that he's capable of killing. Despite protesting that he's not a killer, he boasted he had, quote, 'stabbed the motherfucker on Main Street in front of God and everyone with the intention to kill the motherfucker.' Pardon me. He just wasn't successful. And that boast was made to a detective investigating a murder.

"Now not being successful at a murder is a far cry from being incapable of committing murder. Also, bear in mind that the defendant admitted to Denise Mancha that he had killed before."

Later, the prosecutor showed a list to the jury of what he asserted were the lies defendant told detectives about this case, and the evidence that showed defendant was lying. In going down the list, the prosecutor stated, with respect to one of the items: "'I'm not a killer,' [defendant] tells Detective Hale. But in the letter to Denise Mancha, he says, 'I've killed.' His admission to Detective Hale that he stabbed someone with the intention of killing him, his admissions to Serena, Rodriguez, and Gomez that he killed Ray Sabala, and Dawn Santos' testimony that she witnessed him kill Ray Sabala …."

70.

Defendant now contends the prosecutor committed misconduct by (1) referencing the stabbing admission in opening statement, when the statement was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted"; (2) attempting to admit evidence of same during the People's case-in-chief; and (3) referencing the subject in closing argument despite the fact the trial court sustained defendant's objection to the evidence. He says this pattern of misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.

Defendant failed to object to all but one of the instances of asserted misconduct. We are not persuaded a timely objection and request for admonition would have been futile, or an admonition insufficient to cure any harm. (Cf. *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834-835; *People v. Johnson* (1981) 121 Cal.App.3d 94, 103-104.) Accordingly, he has forfeited his claims with respect to the prosecutor's remarks in opening statement and closing argument.

With respect to the prosecutor's examination of Hale, defendant did not assign the questioning as misconduct. Nevertheless, we conclude he preserved his claim of prosecutorial misconduct for appeal, because "through his relevance objection he gave the trial court an opportunity to correct the asserted abuse — an opportunity the court took advantage of by" sustaining defense counsel's objection. (*People v. Young*, *supra*, 34 Cal.4th at p. 1186.)

Turning to the prosecutor's questioning of Hale, "[a] prosecutor commits misconduct by intentionally eliciting inadmissible testimony. [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 925; accord, *People v. Smithey* (1999) 20 Cal.4th 936, 960.) We think it possible the prosecutor believed — albeit erroneously — the testimony was admissible.[44] Even if an experienced prosecutor legitimately could have harbored such a

---

[44] Although we do not suggest the trial court erred by sustaining defendant's objection, we note that a defendant's own statements are admissible against a hearsay objection (§ 1220; *People v. Davis* (2005) 36 Cal.4th 510, 535) and may also be admissible if offered for a nonhearsay purpose (*People v. Davis*, *supra*, at pp. 535-536),

71.

belief, however, "a showing of bad faith or knowledge of the wrongfulness of his or her conduct is not required to establish prosecutorial misconduct. [Citation.]" (*People v. Smithey*, *supra*, 20 Cal.4th at p. 961.)

The prosecutor's questions about whether defendant said he had never killed before and whether this contradicted his statement in the letter, were proper. The improper elicitation of information regarding prior stabbings did not amount to an egregious pattern of misconduct that rendered the trial fundamentally unfair. (See *People v. Smithey*, *supra*, 20 Cal.4th at p. 961.) Assuming it constituted misconduct under state law, it was not prejudicial. The trial court sustained the objection, and subsequently gave the standard jury instruction on objections. (See *People v. Foster* (2010) 50 Cal.4th 1301, 1351; *People v. Sandoval* (1992) 4 Cal.4th 155, 182, affd. *sub nom. Victor v. Nebraska* (1994) 511 U.S. 1.)

Defendant contends he was denied his constitutional right to the effective assistance of counsel by his trial attorney's failures to (1) object when the prosecutor mentioned the stabbing admission in opening statement, (2) make an in limine motion to preclude the prosecutor from attempting to introduce the evidence at trial, and (3) object and request an admonition when the prosecutor argued the evidence in summation. We disagree.

---

although in each instance they must be relevant to an issue in dispute (*ibid*.; see *People v. Price* (1991) 1 Cal.4th 324, 416-417). A *witness*'s prior inconsistent statement is often admissible (§§ 770, 1235; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 710), and some out-of-court statements are treated as "testimony" (and, arguably, their declarants as "witnesses") when used as substantive evidence of guilt (see Pen. Code, § 1111; *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1083, disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1370-1371, 1387). At least when a defendant's extrajudicial statement is offered by *the defense*, the defendant's credibility is subject to impeachment. (*People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1448-1450; but see *People v. Fritz* (2007) 153 Cal.App.4th 949, 955-956.) Moreover, although character evidence is inadmissible to prove conduct on a specified occasion (§ 1101, subd. (a)), this restriction is inapplicable when the evidence is offered on the issue of a witness's credibility (*id.*, subd. (c); *People v. Abel*, *supra*, 53 Cal.4th at p. 928).

"[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor 'was "so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted."' [Citation.]" (*People v. Wrest* (1992) 3 Cal.4th 1088, 1108.) We are not sure the evidence here met this standard, or that the trial court would have had enough information before it to enable it to rule on an in limine motion to exclude that evidence. Thus, we cannot conclude, on the record before us, that counsel's failure to object or make such a motion constituted deficient performance.

The prosecutor did, however, commit clear misconduct in closing argument to the extent he violated the trial court's ruling, even if he did so unintentionally (see *People v. Friend* (2009) 47 Cal.4th 1, 33; *People v. Crew* (2003) 31 Cal.4th 822, 839), and by arguing facts not in evidence (*People v. Lopez* (2013) 56 Cal.4th 1028, 1073; *People v. Hill* (1998) 17 Cal.4th 800, 827-828). However, "even where the prosecutor's statements amount to misconduct, defense counsel may have sound tactical reasons for not objecting. 'The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' [Citation.]" (*People v. Padilla* (1995) 11 Cal.4th 891, 940, overruled on another ground in *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) "'Failure to object rarely constitutes constitutionally ineffective legal representation....' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206.)

In the present case, even if we assume the prosecutor committed misconduct in opening statement as well as closing argument and that defense counsel might have successfully moved in limine to exclude evidence of defendant's attempted murder admissions, "the appellate record sheds no light on why trial counsel acted as he did; he was not asked to explain his performance; although we may doubt that a satisfactory

73.

explanation could be provided, we are unable to conclude that it could not. Thus, we must reject defendant's point." (*People v. Bell* (1989) 49 Cal.3d 502, 546, fn. omitted.)[45]

**B.  Offering and Arguing Evidence Defendant was Ex-Convict at Time of Offense**

On direct examination, the prosecutor questioned Hale about defendant's statement that he felt like he had saved Sabala, because Gonzalez had asked defendant for a gun and defendant did not give him one. The prosecutor elicited this denial was inconsistent with previous statements defendant had made, including that defendant previously said he sold or loaned Gonzalez a gun, and expressed concern his (defendant's) fingerprints would be found on the murder weapon. This ensued:

> "Q  Did the defendant acknowledge to you that he possessed guns?
>
> "A  He did.
>
> "Q  Were you aware that the defendant had felony convictions?
>
> "A  I was.

---

[45]  We also reject defendant's claim the fact counsel objected and moved to strike the evidence when it was offered at trial refutes any inference counsel was pursuing some tactical advantage by failing to obtain in limine exclusion of the evidence or withholding objection when the prosecutor referred to it in closing argument. The cases defendant cites in support of his assertion deal with much different factual scenarios than those of defendant's case and, accordingly, fail to persuade us counsel could have had no reasonable tactical purpose under the circumstances that confronted him in the present trial. (See *People v. Roberts* (2011) 195 Cal.App.4th 1106, 1114-1115, 1130-1131 [prosecutor sought to establish defendant's out-of-state conviction constituted strike under California law; defense counsel objected to all statements in transcript of plea and sentencing hearing on hearsay grounds, but failed to argue post-plea statements of defendant and others were inadmissible because they were not part of entire record of conviction as required by applicable California Supreme Court precedent]; *People v. Asbury* (1985) 173 Cal.App.3d 362, 365-366 [original jury found special circumstance not true, thereby necessarily rejecting notion murder occurred during course of robbery; on retrial, defense counsel unsuccessfully objected to felony-murder instructions on ground of insufficient evidence, but failed to object on meritorious ground that issue was barred by prior adjudication].)

"Q Is it your understanding that a person who has felony convictions is not allowed to own or possess a firearm?

"[DEFENSE COUNSEL]:  Object to relevance.

"[PROSECUTOR]:  It's knowledge of possession of a dangerous weapon, leads to the inference that he had the gun, had a gun at the time of his death.

"[DEFENSE COUNSEL]:  How … is Mr. Chuck Hale's awareness that my client had felony convictions even admissible?

"THE COURT:  Sustained.

[PROSECUTOR]:  [¶]  Q  What is a Tech [*sic*] 9?

"A  It is an outlawed weapon.  It's actually stated in the Penal Code, it is an outlawed weapon.  It is an automatic pistol type weapon that shoots a 9 millimeter cartridge.

"Q  Is a Tech [*sic*] 9 legal for a person to own or possess?

"A  No.

"Q  Was the defendant authorized to possess any firearm at that time?

"A  No, he was not.

"Q  Did the defendant indicate to you during his interview that he owned a Tech [*sic*] 9 at one time —

"A  He did.

"Q  — prior to the murder?  Did the defendant indicate that he had more than the Tech [*sic*] 9 as firearms?

"A  He did.

"Q  Did he indicate that he had owned or possessed a 9 millimeter?

"A  He did.

"Q  Is the 9 millimeter the gun that the evidence indicates Raymond Sabala was killed with?

"A  It's —

75.

"[DEFENSE COUNSEL]: I'm going to object to the way that question was asked because it seems like —

"[PROSECUTOR]: I'll restate it. [¶] … [¶] Q What caliber weapon was Raymond Sabala killed with?

"A From the evidence and the information that we have, it appears he was killed with a 9 millimeter caliber weapon."

During closing argument, the prosecutor told jurors, without objection: "The defendant, by his own proud admissions, is a scary, manipulative, and threatening man. You have heard evidence that he beats women. And despite being a convicted felon, he carries firearms, including, not coincidently, a 9 millimeter." Later, during his argument as to why jurors should believe Santos, the prosecutor stated, again without objection: "There can be no denying that what Dawn chose was the toughest option available to her and the most terrifying. Coming into this courtroom, looking at him, looking at you, testifying against him, that was far and away a tougher road than denying that you [*sic*] knew anything about it or saying that someone who is long dead did it, to tell the truth and identify a menacing felon, woman beater, and murderer, John Loco Man Rivera, as Ray's killer."

Defendant now says the prosecutor committed misconduct by propounding questions about defendant's prior felony convictions, and, once the trial court sustained defense counsel's objection, including the information in argument to the jury. We discern no prejudice.

We agree the prosecutor should not have asked Hale whether defendant had felony convictions, and whether a person with felony convictions is allowed to own or possess firearms. (See *People v. Ozuna* (1963) 213 Cal.App.2d 338, 341.) The prosecutor's asserted purpose for asking those questions was adequately achieved by the remainder of the quoted questioning.

Defendant says that because the fact of his prior convictions was "patently irrelevant" to the issues, the only possible conclusion to be reached is that the evidence was offered to show defendant was an ex-convict with prior felony convictions, which in

76.

turn "would show his debased character and criminal disposition." Defendant did not object on this ground at trial, however, and "a relevance objection does not, in itself, alert the trial court to the claim that the testimony objected to is inadmissible character evidence." (*People v. Demetrulias*, *supra*, 39 Cal.4th at p. 21.) In any event, the trial court sustained the objection defendant did make (see *People v. Foster*, *supra*, 50 Cal.4th at p. 1351; *People v. Sandoval*, *supra*, 4 Cal.4th at p. 182), and subsequently instructed the jury regarding objections.

Defendant did not object to any of the challenged portions of the prosecutor's summation. His related claims of misconduct therefore have not been preserved for appeal. (Cf. *People v. Navarrete*, *supra*, 181 Cal.App.4th at p. 834; *People v. Johnson*, *supra*, 121 Cal.App.3d at pp. 103-104.) We reject defendant's claim trial counsel was ineffective as a result; even assuming the prosecutor committed misconduct by violating the trial court's ruling (see *People v. Friend*, *supra*, 47 Cal.4th at p. 33; *People v. Crew*, *supra*, 31 Cal.4th at p. 839), Warmsley suggested defendant was on parole at the time of the Reclosado incident. In addition, jurors knew defendant had been convicted of kidnapping (albeit not at the time of Sabala's murder) and been imprisoned, and that he admitted possessing guns, including of the caliber likely used to kill Sabala. Under the circumstances, defense counsel reasonably could have declined to object, especially in light of the trial court's instruction — given both before and after the evidentiary portion of trial — that nothing the attorneys said was evidence. For the same reasons, and particularly in light of everything else the jury learned about defendant, defendant was not prejudiced by counsel's failure to object. (Cf. *People v. Ozuna*, *supra*, 213 Cal.App.2d at p. 342.)

C.     Questioning Sheree Gregory About Alleged Illicit Relationship

During the prosecutor's cross-examination of Gregory, Gregory testified she had used drugs one time in the past three years. This ensued:

"Q. When was that?

"A. June, I think. I got stopped by the police, and I was with my boyfriend.

"Q. Well, that's not exactly true, is it, Ms. Gregory?

"A. Why?

"Q. Where were you?

"A. We were on La Paloma Road, and we got stopped.

"Q. And you were involved in an illicit relationship out there at that time, were you not?

"A. I was sitting there with my boyfriend. Yes.

"Q. All right. Your boyfriend who — you were contacted by the police?

"A. Yes.

"Q. The sheriff's deputies?

"A. I think that's what they were.

"Q. All right. And didn't you tell them that the person you were with was a married man and that you were sneaking out there to be with him?

"A. No, I was not.

"[DEFENSE COUNSEL]: Objection. Relevance.

"THE COURT: Sustained."

Although defendant objected on the ground of relevance and not prosecutorial misconduct, we find the objection sufficed to preserve the issue for appeal. (See *People v. Pearson*, *supra*, 56 Cal.4th at p. 434; but see *People v. Dykes* (2009) 46 Cal.4th 731, 766.) We agree with defendant that the prosecutor committed misconduct. "A witness may not be examined on matters that are irrelevant to the issues in the case. [Citations.]" (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 755.) "It constitutes misconduct to examine a witness solely for the purpose of implying the truth of facts stated in the question rather than in the answer to be given, and a prosecutor should not pursue a line of questioning

78.

that is damaging but irrelevant. [Citations.]" (*People v. Dykes*, *supra*, 46 Cal.4th at p. 766.) In addition, "'[i]t is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citations.]" (*People v. Smithey*, *supra*, 20 Cal.4th at p. 960.)

Gregory's sexual history — even assuming it involved marital infidelity on the part of one or both participants — was so patently irrelevant, we do not believe any reasonable prosecutor could have thought otherwise. (See, e.g., *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1026, 1034.) As this court has observed (ironically in a case in which the County of Merced was a party), "County furnishes no support for the thinly veiled proposition that promiscuity engenders prevarication other than speculation and innuendo. The argument is predicated upon a perception and stereotype that has neither a basis in experience nor proof. Common perceptions do not rise to the level of truth simply because of repetition or general regard." (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 575.)[46]

Here, the prosecutor did not continue to attempt to elicit the improper evidence after the court sustained defendant's objection, and he did not question the deputy about anything Gregory might have said about her relationship with the man in the vehicle with her. (See *People v. Smithey*, *supra*, 20 Cal.4th at p. 960.) This, together with the trial court's sustaining of the objection and subsequently instructing the jury on objections, was sufficient to obviate any prejudicial effect of the misconduct.

---

[46] We recognize that criminal conduct amounting to a misdemeanor may be admissible in a criminal trial to impeach a witness if that misconduct involved moral turpitude. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-296, superseded by statute on another point as stated in *People v. Duran* (2002) 97 Cal.App.4th 1448, 1459-1460.) Assuming Gregory's relationship once would have constituted the crime of adultery — something not at all certain (see *Zonver v. Superior Court* (1969) 270 Cal.App.2d 613, 618-619; *People v. Bealey* (1927) 81 Cal.App. 648, 650) — the statutes criminalizing adultery in this state were repealed in 1975 (see former Pen. Code, §§ 269a, 269b, repealed by Stats. 1975, ch. 71, §§ 5-6, p. 133).

## D.  **Commenting on Defendant's Reaction to Testimony**

During cross-examination of Serena, defense counsel asked if Serena had ever had a "beef" with defendant in prison.  Serena responded, "No.  I protected him in prison." The reporter's transcript reflects defendant nodded his head.

In the course of his argument to the jury, the prosecutor discussed Serena's testimony that defendant had admitted killing Sabala, and defendant's claim he never denied being the killer because it was good for his reputation.  This ensued:

> "[PROSECUTOR:]  Why would Jesse Serena lie?  He said he first notified authorities in 2003 because he was concerned that the defendant had plans to kill Rosemary.  He's known the defendant for years.  Nothing the defendant says to Jesse Serena is going to change Jesse's view of the defendant.  And as you could see for yourself, nothing that the defendant could possibly say is going to impress a man with a life history of Jesse Serena.  To the contrary.  Jesse Serena gave you a peek inside prison life and testified that Rivera was lying when he said that claiming credit for crimes on the outside enhanced your reputation on the inside.  The only thing that matters, according to a man who has been in prison for more than a decade, is what you do and who you are on the inside.

> "There was a revealing moment in Jesse Serena's testimony that I believe many of you saw.  At one point, Jesse said that he and the defendant were members of the same prison gang and that he protected the defendant.  And I think many of you saw that the defendant actually nodded in agreement when Jesse Serena said that.

> "[DEFENSE COUNSEL]:  I'm going to object.  I didn't see Mr. Rivera nod.

> "[PROSECUTOR]:  Your Honor —

> "THE COURT:  It's argument.  Overruled."

"[O]ne accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on … circumstances not adduced as proof at trial.  [Citation.]" (*Taylor v. Kentucky* (1978) 436 U.S. 478, 485.)  "It is misconduct … for a prosecutor to comment on a nontestifying defendant's courtroom demeanor or behavior during the guilt phase of the trial" (*People v. Blacksher* (2011) 52

80.

Cal.4th 769, 840), "unless such comment is simply that the jury should ignore a defendant's demeanor [or behavior] [citation]" (*People v. Boyette* (2002) 29 Cal.4th 381, 434). "In criminal trials of guilt, prosecutorial references to a nontestifying defendant's demeanor or behavior in the courtroom have been held improper on three grounds: (1) Demeanor evidence is cognizable and relevant only as it bears on the credibility of a witness. (2) The prosecutorial comment infringes on the defendant's right not to testify. (3) Consideration of the defendant's behavior or demeanor while off the stand violates the rule that criminal conduct cannot be inferred from bad character. [Citations.]" (*People v. Heishman* (1988) 45 Cal.3d 147, 197, abrogated on another ground in *People v. Diaz*, *supra*, ___ Cal.4th ___ [2015 Cal.Lexis at p. *23].)

Defendant has, however, forfeited this claim on appeal. His objection simply raised the issue of whether defendant actually nodded. It failed to inform the court of the issue whether jurors properly could consider defendant's behavior, and so did not allow the court to make a fully informed ruling on the subject. (See *People v. Blacksher*, *supra*, 52 Cal.4th at pp. 828-829.)

We can imagine no reasonable tactical purpose defense counsel could have had for choosing to object but then withholding a meritorious objection, and we cannot say such an objection would have been futile. With respect to prejudice, the trial court instructed the jury that nothing the attorneys said was evidence, including the remarks made in opening statements and closing arguments. Standing alone, this instruction was insufficient to cure any harm, because by overruling defendant's objection and failing to admonish the jury, the trial court arguably gave jurors the incorrect impression defendant's behavior was indeed evidence upon which the prosecutor was free to comment. (See *U.S. v. Pearson* (11th Cir. 1984) 746 F.2d 787, 796.) However, the court also told jurors, "It is up to all of you and you alone to decide what happened based only on the evidence that has been presented to you in this trial," and, "You must decide what the facts are in the case. You must use only the evidence that was present[ed] in this

81.

courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I *told* you to consider as evidence." (Italics added.) The court *told* jurors they could consider behavior only in conjunction with evaluating a *witness*'s credibility. Defendant was not a witness. (See *People v. Garcia* (1984) 160 Cal.App.3d 82, 92 & fn. 9.) In light of these instructions and the point at which defendant nodded (which was accurately stated in the prosecutor's remark), we see no reasonable probability the result would have been different absent counsel's omission.[47]

## E. Vouching for Prosecution Witness

There can be no doubt Santos was a critical witness for the prosecution, and the prosecutor recognized her as such. Her drug use and changing versions of events were topics that were fully explored at trial.

At the outset of his argument to the jury, the prosecutor discussed the rights enjoyed by Americans, and he explained why he did not believe defendants have too many rights under our system. He stated: "I mention this because it's important that you understand that the prosecution, though it represents the People of the State of California and has brought the charges in this case, has been completely committed to protecting the rights of the defendant in this case." He then catalogued some of the ways in which this had been done, such as by defendant having the services of a capable attorney, the right to discovery, etc. The prosecutor then discussed how Sabala also had rights, and how defendant stole from Sabala the most important right of all, "the right to his very life."

The prosecutor subsequently turned to his view of what the evidence showed about Sabala's murder. After discussing some of the prosecution witnesses, he stated:

---

[47] Assuming we might have applied a different standard of review had defendant not forfeited his direct claim of prosecutorial misconduct, "the *Strickland* [*v. Washington*, *supra*, 466 U.S. 668] 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights. [Citations.]" (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008-1009.)

"Now, finally, let's talk about Dawn Santos. To be very candid, ladies and gentlemen, when everything in this trial is said and done, everything else, all the evidence is said and done, nothing has changed from when we first came in here. If you believe Dawn Santos, the defendant is guilty. If you believe Dawn Santos, we're done. It's that basic."

The prosecutor proceeded to argue Santos had no motive to lie, and could have continued to deny any knowledge of the killing as she had done successfully for a number of years, or she could have pointed the finger at Gonzalez, who was dead and could not dispute or deny anything. The prosecutor expressed hope that the fact Santos did not choose either option reinforced her credibility in the jurors' minds. He stated:

> "Dawn didn't choose either of those options. Instead, Dawn chose the toughest. There can be no denying that what Dawn chose was the toughest option available to her and the most terrifying.…

> "See if the defense can give you a plausible explanation for why Dawn Santos would put herself in such jeopardy when there were two infinitely less dangerous options available to her. They can't because there isn't. The truth was always the hardest choice.

> "Dawn Santos was a lost and mixed-up young woman with a wicked drug problem and running with the wrong crowd in 1998. She witnessed something that nothing could have prepared her for, and it has haunted her for the last 12 years. Dawn Santos finally knew that she could not run away, either through drugs or alcohol, from the truth of what happened on April 21st, 1998. She had to confront the ghost of Ray Sabala in order to put her life back together, and she's done that. She has made a lifetime of mistakes for such a young woman, but seems finally to have begun the process of reclaiming her life.

> "What she has done in this case, admittedly 12 years later than it should have been done, is nothing short of courageous. But it is also consistent with the other changes that have taken place in Dawn's life. You heard her probation officer testify that Dawn was one of only two people, two people out of 50, who made it through an 18-month drug program without a single dirty test, one of only four and five who completed the drug program — or Drug Court program. That tells you where Dawn Santos is now. *The Dawn Santos of 12 years ago we would not have felt comfortable putting up before this jury. The Dawn Santos that we presented to this jury, we stand shoulder to shoulder with her.*

83.

"[DEFENSE COUNSEL]:  I object to that as vouching, Your Honor.

"THE COURT:  And it's noted for the record and noted that it's argument, pure argument.  And with that, overruled.  [¶]  Proceed.

"[PROSECUTOR]:  Thank you.  [¶]  We had an interesting discussion, ladies and gentlemen, during jury selection about the burden of proof in a criminal trial.  The People bear that burden under the law, as you know.  But we had a robust conversation about whether the District Attorney should have a higher burden if the charge is murder than if, say, the charge is drug possession or theft.  [¶] … [¶]  As provocative as that discussion was, however, ladies and gentlemen, we believe it has become a completely moot point.  Because by any standard, we have proved the guilt of John Rivera certainly beyond a reasonable doubt.  An eyewitness, three confessions by the defendant, and circumstantial evidence in the form of a child support check, all clinging like flypaper to the defendant.  And lies.…"  (Italics added.)

In his closing summation, the prosecutor argued that the evidence supported Santos's testimony, and her story corroborated all the physical evidence.  He stated:

"This isn't a CSI case, ladies and gentlemen.  This is a testimonial case.  And if … you come back in this courtroom with a not guilty verdict, what you're saying, in effect, because it's about this straightforward, is that you think Dawn Santos got on that witness stand and lied.  She came in here and told all of you an incredibly awful, horrific lie, the worst kind of lie, pointing the finger at someone and accusing them of taking a human life when he didn't do that.  There is no place else for you to go.

"So what we would suggest very respectfully to you is *Dawn's testimony is true*.  *Dawn's testimony was honest*.  Flawed as Dawn has been, I think all of us would feel some pride that she seems to be moving her life in a good direction or at least the past 18 months of moving in that direction.  *The testimony she gave from the stand is true*.  Who would make that up?  Who would lie about that?  For what reason?  And if you just start there, then look at all the evidence that reinforces it."  (Italics added.)

84.

Defendant now says the italicized remarks constituted improper vouching for the veracity of a prosecution witness. Considering the remarks in context, we find no misconduct.**48**

"The general rule is that improper vouching for the strength of the prosecution's case '"involves an attempt to bolster a witness by reference to facts outside the record."' [Citation.] Thus, it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.] Specifically, a prosecutor's reference to his or her own experience, comparing a defendant's case negatively to others the prosecutor knows about or has tried, is improper. [Citation.] Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record. [Citations.]" (*People v. Huggins*, *supra*, 38 Cal.4th at pp. 206-207.) "In either case, prosecutorial comments may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence. [Citation.]" (*People v. Cook* (2006) 39 Cal.4th 566, 593.)

"It is not, however, misconduct to ask the jury to believe the prosecution's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence, of the events that led to the trial. It is not misconduct for a party to make explicit what is implicit in every closing argument ...." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 207.) "[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [his or] her

---

**48**     Defense counsel did not object to the second set of quoted comments. In light of the trial court's overruling his objection to the first set, however, counsel reasonably could have believed a further objection on grounds of vouching would have been futile.

comments cannot be characterized as improper vouching. [Citations.]" (*People v. Frye*, *supra*, 18 Cal.4th at p. 971.)

In the present case, the prosecutor's assurances of Santos's veracity were clearly based on record evidence and inferences reasonably drawn therefrom. This is true even of the "shoulder to shoulder" remark, which most closely approaches impropriety. (Compare *People v. Ochoa* (2001) 26 Cal.4th 398, 443 [prosecutorial argument witness was honest man, one of best witnesses that could be had in murder case, and kind of witness prosecutor wished to have more of, did not constitute misconduct], disapproved on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14, with *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1583-1585 [prosecutor committed misconduct by stating she had taken oath as deputy district attorney not to prosecute case if she had any doubt crime occurred].)[49]

## IV

### CUMULATIVE PREJUDICE

Defendant contends he was denied due process by the cumulative effect of the claimed errors. (See, e.g., *Montana v. Egelhoff* (1996) 518 U.S. 37, 53; *People v. Hill*, *supra*, 17 Cal.4th at pp. 844-845.) We have, of course, identified several errors that occurred during trial. Thus, defendant did not receive a perfect trial. He was entitled to a trial that was fair, however, not to one that was perfect. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1009.) We have reviewed the trial record in its entirety, and conclude he received that to which he was entitled, whether we consider the errors singly or cumulatively. (See *People v. Abel*, *supra*, 53 Cal.4th at p. 936; cf. *People v. Hill*, *supra*, 17 Cal.4th at p. 845.)

---

[49] Because there was no improper vouching, the trial court did not abuse its discretion by overruling defendant's objection. (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

## **DISPOSITION**

The judgment is affirmed.

_____

DETJEN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

SMITH, J.